The eye-witnesses to the transaction were Mrs. A. E. Sherrill, mother of deceased, and the prisoners, Thomas J. White and Chalmers L. White, and their direct testimony is here set out.
Mrs. Sherill [Sherrill], mother of deceased, testified for the State: "Chal. and Tom White came there very early in the morning before I got up; it was before sun-up; they came from the south; I did not see them come, but they hitched their horses on the south side of the railroad that goes in south; they were in a two-horse buggy, driving two horses; I did not know them when I went to the door; I had seen them often, but, as I say, I did not know them. The prisoners came up from the left side of the house — on the west, I might say, of the front side; they hitched their horses to a post, I suppose; can't say whether they were hitched or not. This post was about 50 yards or a (706) little further from the house or porch; the porch is on the north side of the house; its width I do not know; I have never measured it; its length is about 12 or 15 feet, I guess; I do not know; it is an old-fashioned piazza, with wide door and latticed around. On the morning of 17 September 1 was in my room and heard some one knock at the front door. I stepped in the front room to the window and called to them that I would be down in. a few minutes. I stepped back and dressed, opened the door and saw two strangers; they said to me, `We want to see Russell.' I said he was asleep, and then they asked me to tell him to come down; said they didn't want to see me, and to tell him some gentlemen wanted to see him. Russell said, `Who *Page 507 
is it?' and I said, `I don't know, they are strangers; come down.' I went down myself and stepped into the back hall on the front porch and stood there until Russell came down; when he came down I stepped back and stood about midway the door. They said to me, `You stay back, and we will see you later.' I did not do it; I stepped immediately to the front door, near my son. Two pistols were drawn on my son in this way (indicating pistol pointing on each side). They then said, `We are Tom and Chal. White; you are aware you have ruined our niece, Annie White, and we have come to make you marry her, or we will kill you before you leave our sight.' Russell said, `I did not ruin her; I was not the first one there.' They said, `You did ruin her, and you will marry her or we will kill you before you leave our sight.' I stepped between them and begged them not to kill my son. I told them if they could not spare him for his own sake, then for mine, at least. I turned to the brothers and they said, one of them, `I am deaf,' and then one said, `You go back; we will see you later. I stepped inside the door, and they again said, `You go back or we will kill you.' And my son said, `Go,' and I said, `I will go.' The deaf man followed my son and kept him from going into the door. They said, `You will go. with us,' and Russell said, `I do not love her, and I cannot do it.' Two pistols fired immediately, and (707) he fell. He fell straight back with his head towards the west, towards the bench that he had been sitting on. Yes, when I went to the door he was seated on the bench. That bench was right along on the west side of the porch, and he was seated here (indicating) on the bench at the west end of the porch. The bench was about 5 feet long. He was about midway the bench, about the middle of the porch. The bench was sitting one end back against the lattice. They were talking to me then — both pistols drawn on Russell. That's when they said, `You go back; we will see you later.' They were still talking to him. When he was shot I do not know whether I fell or sank down, or what I did. I must have gotten up and went to my son to see if he was dead, and spoke to him, and he did not give me any answer. I thought he was dead, and went immediately into the walkway of the yard. These two men just stepped off after they had killed him. My son, when he was shot, got up and came to the door and would have come in, but they kept him from coming and pushed him a little to one side, and I saw his hand go up before his face. My son did not have a thing in his hand, not a thing; he threw up one hand; I saw only one hand. Two shots were fired right together, and then a third one; I do not know whether both men shot or not; there were two shots, though, right together, and then a third. My son was hit in the back of the head and in the face. One man was on each side of *Page 508 
my son when he was sitting down and when he was standing. They had their pistols then."
(Mrs. Sherrill then described the position of her son and the two White boys. One thing in particular the reporter caught was the close proximity of the White boys to Russell Sherrill, that is to say, they pressed him closely on each side, as Mrs. Sherrill went on to show. She demonstrated how his retreat was cut off from the door, pistols in hand.)
(708) "My son stepped out towards the deaf man, and he turned then to the left to pass the tall man. Chal. White moved forward to the right. (Mrs. Sherill [Sherrill] here again takes up the position of the men). Russell fell to the left toward the bench, `caticorner' — not so much so, however. When these men first came my son was in bed and I told him to get up; he came down in a very few minutes; did not more than half dress himself; he just had on his pants and dress shirt and shoes; his shoes were tics, but were not tied at the time, and he had a hat on his head."
Q.: Now, Mrs. Sherrill, Chal. White testified that you came out on the porch, took a seat and said you wanted to talk the matter over; that you were sorry this had come about; that you had tried to raise the family better. Did you say that? A.: I did not say that.
Q.: Did you sit down? A.: I did not.
Q.: State whether or not, at the time your son was shot, he was making any attack upon either of the prisoners. A.: He was not; he had his hand up to ward off the pistol.
Q.: Did Thomas White touch you on the shoulder, as he testified he did? A.: He did not.
The prisoners testified that, having heard that their niece had been ruined by the deceased, they went to the home of Mrs. Sherrill, where deceased lived, with a view and purpose of inducing him to marry their niece, and save the families the disgrace; that they each had a pistol, but there was no conspiracy between them to kill the deceased, and no intention of doing so, but thought they could persuade the deceased to marry the girl. Chalmers White testified in behalf of himself and coprisoner: "When I left my sister-in-law's, I started early in order that we might find him at home before he would leave. I had information of his probable leaving, and I had another reason for wanting to go early. I wanted it kept as quiet as possible until it was over. It was not more than three-quarters of a mile, possibly a mile, but I do not think over three-quarters. I arrived there, (709) I think, about 6 in the morning. It was a dark, cloudy morning — a fog, and a very dark morning. We hitched our horses out in front of the porch or out from the house to a hitching-post, and *Page 509 
then went to the house and knocked; walked upon the piazza and knocked upon the door. A lady then answered it. My brother took part in the conversation down to my sister-in-law's; he talked, but not as much as I did, and not as long; but he talked with her; Mrs. Sherrill came to the door and I told her good morning, and asked if Russell Sherrill was at home; she said, `Yes.' I told her I would like to see him on some business; she handed us two chairs; we sat down and waited till he came; presently he came down, his mother with him. I spoke to him and introduced myself and my brother; we both shook hands with him, and I told him we wanted to see him on some business, privately. He then said to his mother, `You go back into the house,' which she did. She walked back into the hall, and he stepped back and closed the door. He then walked out on the piazza to the front end of the porch and sat down on the bench; we walked up near him, around him, in front of him. I said to him, `Mr. Sherrill, you are aware of the fact that we came here to make you keep your promise.' He replied, `I did not do it.' I said, `You must marry her,' and he said, `I cannot; I do not love her.' And I said, `You can't get out of it that way.' He said, `I will fix it up, but I will not marry her; I will die first,' and sprang to his feet in an angry, threatening attitude. I stepped back and drew a pistol. He said, `I will marry her,' and I said, `I am glad of it.' Mrs. Sherrill heard a part of the conversation and came out into the hall. She said, `What is the trouble? Don't kill my boy,' and I said, `He has ruined our niece, Annie White, and we have come up to get him to marry her.' She said, `Well do not kill my boy,' and I said, `I do not want to kill him.' She said, `Let's talk the matter over and save shame and disgrace.' I told her I would. She sat down on a chair just back of us, and said she was sorry her family had come to this; that she had tried to raise the boy (710) better. I then turned and walked back to where Mr. Sherrill was and told him to come on and go with us. He then seemed very angry, began to advance, and then said, `I will die first,' and as he said that he sprang towards us, or forward, and I shot him. My brother fired at him about the same time. I do not know who shot first; we shot nearly at the same time. As he started towards me, Mrs. Sherrill ran from the porch into the hall, screaming at the top of her voice, and as she fell to the floor, we walked off; she was not inside when we fired; she screamed and ran into the hall. He was very close to me, and I think just a little, possibly, to the center of the door; he was very close to me. I thought he was going to strike me with something when he advanced; he was in a striking attitude and in an angry frame of mind. I think he was going to strike me, because he was rushing on me, and I thought I saw something. He could see that I was armed, *Page 510 
and I thought he was armed, and I did not think he would attack me unless he was. I could not see the knife in his hand; he could have held a knife or something I could not see; it was a dark, cloudy morning — a very dark, foggy morning. I went there with no purpose or idea of killing him, no intention whatever; it was only to get him to marry the girl and save shame and disgrace. I never saw him before. My brother and I had never at any time talked about killing him. I did not know I had hit him. I knew I had shot, but did not know I had hit him. When ha started at me, I retreated a step, from time to time, when he started back towards the further end of the porch from where my brother was when he sprang forward; this threw my brother behind him; my brother had been to the left; and this threw my brother almost diagonally between us." The prisoners show on the map what they mean. "When he sprang up he said something to my brother, and he said for him to talk to me, that he could (717) not hear. (Further deccription [description] as to porch and position of men.) The three of us would have made a triangle or three sides of a triangle. He rushed on me with his arm drawn back when I fired, as if to strike, just this way (witness shows striking position of right hand and arm drawn back as if to deliver a blow) I left there; went to my buggy. I did not anticipate any trouble. I took the pistol in case I would need it to protect myself against any one and any danger; was not going up looking for trouble — no, not even with Sherrill. I carried the pistol, though. I would rather have a pistol through the country."
Q.: So you expected trouble, did you?. A.: I did not know what I would find; I did not know how it might terminate.
Q.: So you took him along to help kill this man if he didn't marry your niece, is that it? A.: I didn't take him; he went because we were going on a dangerous mission.
Q.: And you expected trouble, eh? A.: No, but I didn't know the man, and didn't know how it would end.
"From the time we struck that porch until the time he came down, I presume the whole time would be about four or five minutes before he was lying on his back on the floor, dead. It was not my intention to kill him; he didn't give us the opportunity to hear his refusal and go back to Mrs. Archer's quietly. I knew my brother had a pistol; he borrowed it. I do not know where he borrowed it; in Concord, I guess. He sprang to his feet and we drew our pistols; the pistols were not pointing in his face — pointing at him, though, I suppose; my brother's was pointing at him, too."
By the State: Q.: Did you see anything in his hand? A.: I could not tell what he had in his hand. *Page 511 
Q.: Did you see the knife? A.: He had his hand drawn back this way (striking attitude), drawn back as though to strike. I could not see what was in his hand.
Q.: Was there anything in his hand? You say you could distinguish Mrs. Sherrill was a lady when she came to the door. Now, if he had a knife, why couldn't you have seen that? I say, why (712) couldn't you have seen that? I say, why couldn't you? A.: I did not know what he had in his hand; I thought there was something in his hand; I could not tell what it was.
Redirect: "My testimony was interrupted very much by counsel on both sides at the preliminary hearing, and I could not give the testimony as fully as I wanted to. I never had any difficulty in my life before; yes, I stated a while ago, I thought I shot twice; I ascertained I did not, after the pistols had been examined and brought to the attorney's office. That was the day of the preliminary hearing; the pistols were examined and my pistol showed I shot only once; my brother shot twice, as his pistol showed. I did say a while ago we did not want to kill him, and because that would have made matters more public, worse, and the shame would have gone further. I had no intention of killing him."
Thomas White's testimony in behalf of himself and coprisoner (he is deaf): "I can hear through a trumpet in my right ear, but not as well as I can in the other. It was about 6 when we got to Mrs. Sherrill's house. It was daylight; the morning was cloudy and threatening rain. The first thing after arriving we tied our horses (two horses and a top buggy) to a hitching-post about 40 or 50 yards off. We went up to the house and my brother knocked at the door; soon after he knocked, Mrs. Sherrill responded; when she came to the door a conversation took place between her and my brother. I knew Mrs. Sherrill, and did not see why she did not know me. I did not hear the conversation after Mrs. Sherrill came to the door; she set out two chairs; my brother took one and I took the other, occupying opposite sides of the piazza. I said to my brother in a low tone, after she had gone back in the house, `Is he at home?' He nodded assent. In a short time after that Russell Sherrill came down on the piazza; my brother spoke to him, shook hands with him, introduced him to me, and I shook hands. I had seen him, but was not personally acquainted with him. After he came out, Mrs. Sherrill also came out, and a conversation took place between them. Sherrill said something (713) to his mother, and she went back into the hall. Sherrill followed her and closed the hall door; he closed the inner door, then came back and sat down on the bench at the end of the piazza; my brother then went to him, and again the conversation began; in a few minutes after *Page 512 
the conversation he sprang to his feet and assumed a threatening attitude. At that time my brother drew his pistol and stepped back one step. I did not know what had passed; I was just judging from my brother's actions; then almost immediately after that, just after the pistols were drawn, Mrs. Sherrill came out of the hall and a conversation took place between her and my brother. We were all sitting down at the beginning, but at the time Mrs. Sherrill came out we were all standing, and then the conversation took place between her and my brother; Mrs. Sherrill turned to me, and I said, `Talk to my brother; I cannot hear you,' and just at that moment she stepped between us and I touched her on the arm or shoulder and told her not to come between us; this seemed to infuriate Sherrill, from his actions and expressions of his face. He was directing his conversation to me after I touched his mother on the shoulder. It seemed as if I had angered him very much. I said, `Talk to my brother; J cannot hear you.' I then asked my brother if Sherrill would marry her, and he said he would; then I said to Sherrill, `Come and go in the buggy.' Mrs. Sherrill had stepped back a few paces and was near the hall door. The next thing, Sherrill advanced very rapidly on my brother, my brother retreated, and I kept in line with Sherrill, and after passing just beyond the door, halfway, he drew back as if to strike. I saw his hand fly up; I did not see a blade was in it; nay pistol was not drawn; I drew and fired; my brother fired just the instant I did; I think my brother fired just the moment before I did. Sherrill fell diagonally with his head towards the end of the (714) porch; at the moment he fell my brother walked around. We went out, loosed the horses, and I said, `Let's go and surrender at once,' and he said, `Let's go back and tell Jennie what has happened.' My object in going was to induce him to marry my niece and save disgrace, not to themselves, but to all concerned."
The prisoners appealed from a judgment pronounced upon the verdict of guilty of murder in the second degree.
After stating the facts: The above statement gives the direct evidence of all the living persons who saw the occurrence, and presents the case sufficiently to a proper understanding of the Court's decision. *Page 513 
In developing their case before the jury, the prisoners proposed to prove by the witness White, one of the prisoners, that his brother, the other prisoner, asked the witness to go with him to Sherrill's to help him persuade Sherrill to marry the witness's niece, and that the witness informed his brother he would go with him for that purpose, and there was no agreement or conspiracy to use force or violence on Sherrill if he declined. To this testimony the State objected. The objection was sustained, and the prisoners. excepted.
We are of opinion that this ruling was erroneous and the evidence should have been received. The argument to sustain the objection was put on the ground that the proposed testimony was a mere declaration of the prisoner in his own favor, and as such was incompetent. This was no declaration of the prisoner, but his sworn statement in a matter relevant to the issue. The purpose of the prisoner in going to the home of the deceased, in some aspects of the case, was very pertinent, and the prisoner's testimony of such purpose was (715) relevant as substantive testimony, and the declaration to his brother was relevant as corroborative evidence. S. v. Hall, 132 N.C. 1102.
Again, while the judge below in one portion of the charge submitted the question of manslaughter to the jury, in closing the charge he said: "You will consider and determine, upon consideration of all the evidence in this case, and applying the principles of the law as instructed, whether or not the prisoners or either of them is guilty of murder in the first or murder in the second degree." This was no doubt an inadvertence on the part of the court, but the effect, we think, was to withdraw from the jury the question of manslaughter. The prisoners excepted. Where there is evidence admitting a consideration of manslaughter on an indictment of this kind and facts of this character, the prisoners are entitled to have the same submitted under a correct charge, and the failure to do so would be error, because, though the verdict may be for a higher offense, the jury might have convicted of the lower crime if the same had been submitted under a proper charge. We do not think, however, that either of these exceptions presents a case of reversible error, because, assuming the rejected evidence to be true, that in going to the home of the deceased there was no conspiracy to do violence, and that they only went to persuade the deceased to marry their niece, we are of opinion that in considering the entire testimony, including that rejected, and accepting the statements of the prisoners as true, there is no aspect of the ease that would justify a verdict of a lesser crime than murder in the second degree. Of this the prisoners were convicted, and the error of withdrawing the question of manslaughter from the consideration of the jury was immaterial. The question of murder in the first degree not *Page 514 
being before us, and an intentional homicide having been admitted by the prisoners on the evidence in this case, the law presumes the killing to be murder in the second degree, and it must be so (716) declared, unless from the entire testimony the prisoners satisfy the jury that the killing was excusable on the plea of self-defense, or of facts which mitigate the crime to manslaughter. S. v.Smith, 77 N.C. 488. In that case, Faircloth, J., speaking for the Court, says: "Homicide is murder unless it is attended with extenuating circumstances, which must appear to the satisfaction of the jury. If A assaults B, giving him a severe blow or otherwise making the provocation great, and B strikes him with a deadly weapon and death ensues, the law, in deference to human passion, says this is manslaughter"; and the case further states, if the "provocation be slight and it can be collected from the weapon used or any other circumstances that the prisoner intended to kill or do great bodily harm, and death follows, it is murder." Foster's Crown Law, 291. It cannot be contended here that this is a ease of excusable homicide. Two strong, vigorous, and determined men, in the presence of a boy just grown, called him from his bed about daylight in the morning, without arms or means of defense. They were near enough to have seized the deceased at any time during the difficulty, and could have easily overpowered him. The killing was without necessity, and there is no statement or claim by the prisoners that they or either of them were in reasonable apprehension of bodily harm at any time.
Thomas White's evidence:
Q.: You shot him in the back of the head when you could have caught and held him? A.: I could have caught him.
Q.: You say you did not want to hurt him; then why didn't you catch him and keep from hurting him — two great large men like you were? A.: Because he attacked us.
Q.: You were mad, then? A.: No, not mad.
Q.: Not mad, and yet you perferred [preferred] to shoot him in the (717) back of the head instead of holding him? A.: I shot him be cause of the fight on hand. My brother was not struck at all; neither of us hit.
Q.: And yet you shot and killed young Sherrill? A.: Yes, I shot once, and I do not know how many times my brother shot.
Nor is there any well-considered principle of manslaughter to which the conduct of the prisoners could be reasonably referred. It is contended, first, that there was a fight between the parties, and that the homicide should be referred to the anger aroused by mutual combat. It is true that when men fight upon a sudden quarrel, and one kills the other in the heat of passion aroused by the combat, the law *Page 515 
ordinarily refers such a homicide to the anger, and considers the killing a case of manslaughter. The doctrine, however, has this limitation: that the combatants must fight on equal terms, at least at the outset, and no unfair advantage must be taken.
In Russell on Crimes, p. 729, it is said: "Where the combat is not an act of deliberation, but the immediate consequence of sudden quarrel, it does not, of course, come within the foregoing doctrine; yet in cases of this kind the law may come to the conclusion of malice if the party killing began the attack with circumstances of undue advantage; for, in order to save the party making the first assault upon an insufficient legal provocation from the guilt of murder, the occasion must not only be sudden, but the party assaulted must be put on an equal footing in point of defense, at least at the outset, and this more particularly where the attack is made with deadly and dangerous weapons.'
Again, the same author says, on page 731: "If, after an interchange of blows on equal terms, one of the parties on a sudden, and without any such intention at the commencement of the affray, snatches up a deadly weapon and kills the other party with it, such killing will be only manslaughter. . . . But if the party at the beginning prepared a deadly weapon, and has at the time the power of using it in some part of the contest, and uses it accordingly in the course of the combat and kills the other party with the weapon, (718) such killing will be murder."
And Bailey, J., in charging a jury, in an indictment for malicious cutting, said, among other things: "If persons meet originally on fair terms and, after an interval, blows having been given, a party draws in the heat of blood a deadly instrument and inflicts a deadly injury, it is manslaughter Only. But if a party enters in a contest, dangerously armed, and fights under an unfair advantage, though mutual blows pass, it is not manslaughter, but murder."
Accordingly in S. v. Ellick, 60 N.C. 450, we find it declared: "If, on a sudden quarrel, the parties fight by consent at the instant with deadly weapons, and one is killed, it is but manslaughter, provided the parties fight on equal terms and no undue advantage is taken, for the fairness of the fight rebuts the implication of malice and the law mitigates the offense out of indulgence to the frailty of human nature." And, applying the principle, it is there held, "That where words passed between the prisoner and the deceased, who were sitting on a door-sill, and the prisoner got up; the deceased then got up and reached his hand inside the door and got a stick, which was a deadly weapon, and as he was turning around with the stick the prisoner *Page 516 
stabbed him with a bowie-knife, it was held to be murder." To the same effect is Price v. State, 36 Miss. 531.
In several of the decisions establishing the limitation here stated the weapon was concealed, and mention is made of this fact. But the principle underlying the decisions seems to be that the party commenced the fight with a deadly weapon previously prepared and fought at an undue advantage.
The principle, then, by which an unlawful and intentional homicide is, under certain circumstances, mitigated to manslaughter by reason of the anger aroused in mutual combat, has no application here The prisoners, armed with deadly weapons, commenced the fight on unequal terms, fought throughout at undue advantage, and killed (719) without necessity. Their conduct can receive but one construction: they intended. from the beginning of the combat that it should have a fatal termination. Again, it is urged that the prisoner are entitled to have this view presented: that the deceased caused final difficulty by making an assault on the Whites; that he had acquiesced in their demand and all had become peaceful and quiet, when the deceased provoked a further altercation by advancing on Chalmer White, was in the attitude of striking him, and that in the anger aroused by that assault the deceased was slain. But we do not think that any such position is open to the prisoners in their testimony or that it has support either in law or fact. In the first place, there was no such pause in this heartrending occurrence as permits its division into two altercations. The whole affair did not occupy five minute of time. Chalmers White testified (p. 54, record) : "From the time we struck the porch until he came down, I presume the whole time would be about four or five minutes before he was lying on his back on the floor, dead." Allowing a reasonable time for the deceased to dress and come to the porch, the time consumed in this fateful inter view was indeed short. When the deceased said he would not marry their niece, he "did not love her," both men drew and presented their pistols. The deceased then said he would marry her: Thomas Whit then seems to have put his pistol up, but this is left uncertain by the testimony. His evidence is as follows: "I read about where my shot hit him, read about it. He was then with his face towards my brother I could not have shot him in the back of his head from in front of him. I do not know whether he had anything in his hand or not. did say he was attacking my brother. My brother had a pistol; do not know where he got it; when he got up from the chair he assumed a threatening attitude; we never put the pistols back in our pockets; had them) in our hands. We did not have the pistols drawn until he made the attack. We had them in our hands, but did *Page 517 
not have them covered on him. We had them in our hands for (720) protection."
Q.: And then you shot him, not for what he had in his hand, but because he was attacking your brother? A.: I saw there was a fight. I did not stop to see what kind of a fight.
Q. You shot him in the back of the head, when you could have caught and held him? A.: I could have caught him.
Q.: Didn't you say you didn't want to hurt him? Then, why didn't you catch him and keep from hurting him — two great big men like you?
A.: Because he attacked us.
Q.: You were mad, then? A.: No, not mad.
Q.: Not mad, and yet you preferred to shoot him in the back of the head instead of holding him? A.: I shot him on account of the fight on hand; my brother was not struck at all; neither of us hit.
Q.: And just for that, killed young Sherrill? A.: Yes, I shot once, and I do not know how many times my brother shot.
But Chalmers White never put up his pistol till the fatal shots were fired. The deceased was then standing on his own porch, with one armed man on either side, and not allowed to withdraw from their presence even to go into his own door — one of the men, at least, keeping his pistol in evidence all of the time. There was never any pause in this scene, and not for one instant any change of attitude. Here, again, the conduct of the prisoners can receive but one reasonable construction, "Do what we demand and do it now, or your life is forfeited." Any inference, therefore, which depends upon the position that the deceased was the aggressor by bringing on a second altercation, in which he was killed, has no basis in fact, and cannot be maintained. And if it were otherwise, if the deceased did bring on a second altercation, any assault he may have made, under the circumstances just stated, was entirely insufficient provocation to mitigate this killing to manslaughter. The deceased had no knife, and neither (721) of the prisoners say that he had. They do not swear that they thought so. There is nothing but a suggestion that he might have had one. Here is the testimony of Chalmers White: "I then turned and walked to Sherill [Sherrill] and told him to come on and go with us. He then seemed very angry and began to advance, and said, `I will die first.' And as he said that he sprang towards us and forward; and I shot him. My brother fired, I think, about the same time. I do not know who shot first. We shot nearly at the same time. He was very near to me. I thought he was going to strike me with something when he advanced; he was in a striking attitude and an angry frame of mind. I think he was going to strike me, because he was rushing on me; and I *Page 518 
thought I saw something. He could see that I was armed and I though he was armed, and I did not think he would attack me unless he was. I could not see the knife in his hand. He could have had a knife or some thing, I could not see; it was a dark, cloudy morning." Again the witness testified: "When he sprang up we both drew our pistols on him. did not see any knife up to that time. I could not see what he had in his hand."
Q.: Did you see anything in his hand? A.: I could not tell what he had in his hand.
Q.: Did you see the knife? A.: He had his hand thrown back this way (striking attitude), drawn back as though to strike. I could no see what was in his hand.
Q.: Was there anything in his hand? A.: I did not know what he had in his hand. I thought there was something in his hand; I could not tell what it was.
Q.: Couldn't you have seen the flashing of a knife blade as he drew back to strike? A.: It was dark and cloudy. I could not see. He could have a knife and I could not have seen it.
Q.: Will you swear he had anything in his hand? A.: (722) thought he had something in his hand.
Q.: Will you swear that he had a knife? A.: He had some thing; I could not tell what it was.
Q.: Was it long or short? A.: I do not know. I can't tell whether it was long or short or anything about it; it was something.
Q.: Was it black? A.: I can't tell. I cannot describe what it was.
And Thomas White testified: "I had sidestepped and kept in a direct line with Sherill [Sherrill], because I did not know what was going on at that time, nor what he was going to do. He continued to advance on my brother, and drew back as if to strike. At the moment he did that, he sprang forward, and that put him just in front of me, or diagonally in front. I drew my pistol and we both fired about the same time. He had his hand in a striking position. I do not know whether he had a pistol or not. I could not see whether there was a knife in it or not."
The mother of the deceased said that the deceased never raised his hand except to ward off the pistol. But, put it as the prisoners claim and on the facts of this case as disclosed by the testimony, suppose he did raise his hand as if to strike, and was shot down, both prisoners firing at the same time. This was no such provocation as the law deems adequate to reduce the grade of this offense.
In Clark on Criminal Law, p. 197, it is said: "Voluntary manslaughter is where the act causing death is committed in the heat of sudden passion caused by provocation. The provocation must be sue as the law deems adequate to excite uncontrollable passion in the mind *Page 519 
of a reasonable man. The act must be committed under and because of the passion." Again, at page 198: "Intentional killing is manslaughter if it is committed under and by reason of a passion by what the law deems sufficient provocation. The law does not merely look to see if a man was provoked and enraged, and, if so, (723) reduce his crime to manslaughter; but it also looks at the provocation, and does not excuse him at all if it was inadequate to excite his passion. The provocation must be sufficient in the eye of the law, or it is murder," Again, on pp. 203, 204: "In all cases the mode of resentment must bear a reasonable proportion to the provocation. A homicide is not reduced to manslaughter where a deadly weapon is used, unless the provocation was explicit."
To the same effect, S. v. Smith, supra; S. v. Chavis, 80 N.C. 353.
The suggestion that if there be a reasonable doubt as to which one fired the fatal shot, both must be acquitted, cannot be sustained. The prisoners may have gone to the house without any purpose to kill or do unlawful violence. They had a common purpose, and when they drew their weapons they entered on that purpose unlawfully, and were so manifestly acting together, one in the aid of the other, that a killing by either, under the facts of this case, would inculpate both.
The Court is of Opinion that there is no reversible error disclosed in the record, and the judgment of the court below was correct.
No error.
Cited: Dayvis v. Tel. Co., 139 N.C. 93; S. v. Kendall, 143 N.C. 665;S v. McKay, 150 N.C. 815; S. v. Price, 158 N.C. 648, 651; S. v. Lance,166 N.C. 419; S. v. Merrick, 171 N.C. 791; S. v. Bryant, 180 N.C. 691.
(724)