# PATTEN *v.* UNITED STATES.*

---

CRIMINAL LAW; GRAND JURY; APPEAL AND ERROR; HOMICIDE; DANGEROUS WEAPON; CONSPIRACY.

1. A public drawing of grand jurors by the clerk of the court occurs where

---

*\*Homicide—Dangerous Weapon.*—For a note upon the question of what weapons may be considered deadly under the law of homicide and assault, see note to *Crow* v. *State,* 21 L.R.A.(N.S.) 497.

the seal of the jury box is broken in the clerk's office during office hours, by his express authority and while he is standing by. (Following *Fletcher* v. *United States,* ante, 53.)

2. The issuance of a venire is unnecessary, the clerk's certification to the marshal of the names of the grand jurors drawn being sufficient to warrant the marshal in proceeding under sec. 210, D. C. Code (31 Stat. at L. 1223, chap. 854), making it his duty to notify each person drawn, by serving on him notice in writing of his selection, and of the day and hour when he is to attend, and providing that the notice shall be given to each juror in person or left at his usual place of residence.

3. The drawing of a number of grand jurors in excess of the number of vacancies may be ordered under sec. 208, D. C. Code, providing that if any persons selected as jurors cannot be found or shall prove incompetent or be excused, the clerk, under the direction of the court, shall draw the names of other persons to take their places.

4. It is the duty of an appellate court in a homicide case to correct any error prejudicial to the accused, even though not properly raised in the trial court.

5. A man is presumed to have intended the natural or probable consequences of his acts, and if he sets in motion the physical power of another, contemplating the result, he is answerable therefor, though it be produced in a manner not contemplated; and where two or more persons combine or conspire to commit a criminal offense, each is responsible for the acts of the others in furtherance of the common purpose, if the act done is either within the scope of that purpose or is the natural or probable consequence of the act intended.

6. Heavy fence palings several feet long, containing slim wire nails with sharp points, are dangerous weapons such as would be likely to cause death or great bodily injury when employed in a personal assault. (Citing *Hopkins* v. *United States,* 4 App. D. C. 430.)

7. Conspirators who join in a criminal attack upon a defenseless man with dangerous weapons, knock him down, and, when he tries to escape, pursue him with augmented numbers, and continue the assault, are liable for manslaughter where the victim is killed by a knife wound inflicted by one of them during the beating, although they did not in the beginning contemplate the use of a knife.

8. Conspirators who have unlawfully assembled and are actually perpetrating a crime are not liable for an act entirely outside of the common purpose, and not inspired by other conspirators or participated in by them.

No. 2622. Submitted April 6, 1914. Decided May 4, 1914.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia convicting him of manslaughter.                *Affirmed.*

The COURT in the opinion stated the facts as follows:

The appellant, John J. Patten, hereinafter designated as the defendant, was indicted with three others for murder in the first degree, was separately tried and convicted of manslaughter.

Six of the seven counts of the indictment charge that the deceased, John Spencer, was killed in the perpetration, or attempted perpetration, by the defendants of a robbery. The 7th count charges murder in general terms, effected through an assault upon the deceased with a certain sharp metal instrument, not more particularly described. The conviction being of manslaughter, it must be assumed that the jury found the charge that the crime was committed in the perpetration of a felony not sustained; in other words, that the conviction was under the 7th count.

The material facts are substantially these: On the evening of Saturday, July 13, 1912, several young men, including those named in the indictment,—Dougherty, Needham, O'Donnell, and the defendant herein,—resorted to a cemetery at 15th and H streets, N. E., and indulged in drinking beer and wine. The deceased, a colored man, who was reputed to be a degenerate, joined the party some time during the evening. About midnight the police drove them from the cemetery. A little later, Dougherty, O'Donnell, and the defendant Patten being together, Dougherty asked O'Donnell where the colored man was. O'Donnell answered that he was at the power house and wanted O'Donnell to go home with him. Thereupon Dougherty said: "You go and get him, and go home with him and me, and Patten will follow behind you." O'Donnell acceded to this suggestion, and started out Bennings Road with the colored man. Thereupon Dougherty, Patten, and four of the other young men, including Needham, followed. Dougherty and Pattent armed themselves with two heavy fence palings several feet long, con-

taining long, thing, and projecting wire nails with sharp points. They then overtook O'Donnell and the deceased, the four other young men being about a block away. When Dougherty and the defendant came up to the deceased, they both struck him with the palings and felled him. The deceased managed to get up, and ran back toward the other young men, whereupon Dougherty hollered: "For Christ's sake don't let him go, don't let him get away, for if you do we will get into trouble." As the deceased reached the four other young men, Needham seized him, and they both fell down. Patten and Dougherty then ran up and the deceased implored them not to kill him, but they both again struck him with the palings. Dougherty "grabbed hold of the colored man and hollered he had a gun, pistol," whereupon one of the young men looked in the colored man's hand but found no gun. In doing so he got blood on his clothing. Dougherty and Patten then carried the deceased, who evidently was dead, over to the side of the road and left him there. O'Donnell then announced "that he had the money," meaning that he had taken money from the deceased. As they were passing Patten's home, Dougherty said: "Patten, why don't you go into the house." Patten replied: "No, I am not going into the house. There is some money in this crowd and I want to get some of it." They sent to a drug store the money taken from the deceased, amounting to $2, had it changed and divided it among them, Patten receiving his share.

The assistant coroner who performed the autopsy on the deceased testified that he found two wounds on his upper lip, made by a sharp instrument, and another wound on his left groin, the upper part of his leg; that there was a small hole in the trousers worn by the deceased at the time of the assault. The actual size of the wound in the leg was ⅜ of an inch long, about 1/32 of an inch wide, and 2 inches deep. It was this wound that caused death by hemorrhage from a severed artery. Under cross-examination the witness said: "The wound on the groin was the one that caused death; the other wounds were not serious; the wound which resulted in death could not have been made by an ordinary nail, could not be made by any kind of

a nail unless it was some sort of a nail witness is not familiar
with, unless it had been sharpened or something of the kind,—
a horeshoe nail or something of that sort; it was made by an
instrument sharper than a nail; there were no bruises on the
body except the wounds described; those were all that showed;
it is difficult to determine a bruise on a colored person."

Another witness testified that she saw Dougherty about 9:30
or 9:45 on Saturday evening, July 13th, and that he had a
knife with a blade about 4 inches long. There was no evidence,
however, that he had a knife at the time of the assault, none
of the witnesses having seen one.

*Mr. Charles A. Keigwin* and *Mr. James M. Wood* for the
appellant.

*Mr. Clarence R. Wilson,* United States Attorney for the Dis-
trict of Columbia, for the United States.

Mr. Justice ROBB delivered the opinion of the Court:

The first assignment of error relates to the manner in which
the names of the grand jurors were drawn from the box. The
seal on the jury box was broken in the clerk's office during
office hours, by the express authority and direction of the clerk
and while he was standing by. This was a public drawing by
the clerk. *Fletcher* v. *United States,* ante, 53.

After the names of the grand jurors had been drawn the
clerk certified those names to the marshal, who notified them of
their selection and when to appear in court. It is urged that
a venire should have issued. Section 210 of the Code [31 Stat.
at L. 1223, chap. 854] makes it the duty of the marshal, at
least five days before the meeting of the court for which a jury
is required, "to notify each person drawn by serving on him
a notice in writing of his selection as a juror, of the court he
is to attend, and of the day and hour when he is to appear."
That section further provides that "such notice shall be given
to each juror in person or be left at his usual place of residence."

It is obvious that this section dispenses with the necessity for a venire. The Code being silent as to how the marshal shall learn the names of the jurors drawn, the method adopted was a proper one.

The names of twenty-six men were drawn from the box for service on the grand jury, in accordance with the provisions of sec. 204 of the Code. Only nineteen of the twenty-six appeared in court on the first day of the term, and of those eight were excused. It therefore became necessary to fill twelve vacancies. To fill those vacancies the court ordered forty other names to be drawn. The defendant contends that only twelve should have been drawn. The same objection was made at the trial of the case to the drawing of more than the exact number of names, as there were vacancies to be filled when the petit jury was being impaneled.

Section 208 of the Code provides that "if any persons selected as jurors cannot be found, or shall prove to be incompetent, or shall be excused from service by the court, the clerk, *under the direction of the court,* shall draw from the box the names of other persons to take their places." When this point was raised below, the learned trial justice suggested that experience has shown that of the names that have been drawn all cannot be reached; that some of those actually summoned are excused or challenged by one side or the other, and that "those reasons in times past have prevailed on the court until it has become the established practice for the court to order the drawing of a sufficient number of names in his judgment to secure a jury." While this practice, if contrary to law, ought not to be countenanced, it is so obviously sensible and conducive to reasonable expedition that it ought not to be denounced unless contrary to the mandate of the statute. The words of the statute are that "the names of other persons" shall be drawn "under the direction of the court" to take the places of incompetent or excused jurors. If Congress had intended to limit the number to the number actually excused or incompetent, why the provision that the new drawing shall be under the direction of the court? The initial drawing is not, and there would be

no necessity for the court's supervision here unless the court was to be given some discretion as to the number to be drawn. Again, no possible injury can occur to a defendant, for the names drawn are all from the jury box. In other words, they are the names that would be drawn in any event. We see no merit in this contention, and hold that the court was within its authority in the procedure adopted.

The court instructed the jury that under the 7th count it would be necessary, to warrant a conviction, to find that the defendant had a part in the inflicting of the death wound; "that if he did not strike the blow that gave the wound himself, yet that he was so related to the doing of it that it was just the same as if he had done it himself;" that the question would then be whether he did it out of malice; that, if these facts appeared, a conviction of murder in the second degree would be warranted. The jury were then instructed as to what must be proved to warrant a conviction of murder in the first degree, and were told: "Now, if he (the defendant) struck the blow that killed Spencer with his own hand, I do not understand that there is any evidence that would show that it was manslaughter, because there is no evidence tending to show that he was being assaulted by Spencer, or that he did this under the provocation of any assault upon him by Spencer, that is, there is nothing to show that he did it in the heat of blood, engendered by blows that he had received from Spencer. * * * But suppose that he did not strike the blow himself, the fatal blow. Suppose that was struck by someone else. Suppose it was struck by Dougherty. Then it may be an important question for you to decide, you may have to decide, whether the blow was inflicted with one of these staves and the nails that were protruding from them, or whether it was done by some other sharp instrument. Under that count the grand jurors say they do not know what the instrument was. If it was done with one of these staves, and if you find that the two men, Patten and Dougherty, were making an assault upon Spencer, a malicious assault with the staves, without any justification for it, doing it wilfully and purposely, and joining together to make such an assault with such weapons

in their hands, that is, combining to do it, doing it jointly to-
gether in that way, then it would not make any difference
whether the blow was struck by one or the other, both would be
equally guilty of the blow that killed the man. But suppose that
was not the case. Suppose the blow was inflicted with some
other instrument; suppose it was a knife and that Dougherty
used that knife, and that in making the assault, although they
made it together—if you find they did, assuming for the moment
that they did—yet Patten did not know or understand that
there was to be any assault upon Spencer with a knife, that he
understood that the only weapons to be used and being used
were those staves, then it would not be the same if Dougherty
used the knife as it would be if Patten had used it, because in
those circumstances he would not have given his consent to the
use of such a weapon, he would not be guilty of the use of the
knife. But suppose it did not occur in that way, suppose they
combined to make this assault upon him with the staves, and
suppose you find that Patten struck him in the way described by
the witnesses, several times with the staves and Dougherty also
struck him, that they ran after him and knocked him down with
the staves, and that, when he was prostrated or partially pros-
trate, Pattent struck him with a stave again and they were to-
gether beating him, joining in the assault upon him there, the
second part of the assault, and that as a part of that assault
Dougherty did draw a knife and gave him his mortal wound as
a part of the common assault, but without the knowledge of
Patten and without his consent to the use of that kind of a
weapon. Suppose you find that the weapons that were being
used, aside from the knife, were not such weapons as would
naturally cause death, and that Patten had no reason to sup-
pose that the man would be killed by the use of those weapons,
yet in the assault, as I say, Dougherty does strike this fatal
blow with the knife while Spencer is down in that way and
being beaten and assaulted by Patten, and in that way he gets
his death wound from Dougherty. Now, I think that is a case
that would be manslaughter so far as Patten is concerned, be-
cause he helped to do it, although he did not intend that the

man should be killed, yet joining in the assault in that way and helping in it, having him down there where the other man was able to give him a mortal wound, I think he was so related to the matter that unquestionably, as a matter of law, in those circumstances, if you find those to be the facts, you ought to find him guilty of manslaughter."

No exception was taken to this charge, but it is now insisted that the jury should have been instructed that if the fatal wound was made with a knife by someone other than the defendant Patten, and that the use of the knife had not been contemplated by those perpetrating the assault, the offense of the one actually inflicting this wound was of a higher degree than anything within the community of purpose, and hence that the defendant was guilty of nothing more than an assault and battery. In a criminal case, where the charge is as serious as that here involved, it is the duty of an appellate court to correct any error prejudicial to the defendant, even though not properly raised in the trial court. *Hopt* v. *Utah,* 110 U. S. 574, 28 L. ed. 262, 4 Sup. Ct. Rep. 202, 4 Am. Crim. Rep. 417; *Wiborg* v. *United States,* 163 U. S. 632, 41 L. ed. 289, 16 Sup. Ct. Rep. 1127, 1197.

A man is presumed to have intended the natural or probable consequences of his acts, so if he sets in motion the physical power of another, contemplating the result, he is answerable therefor, though it be produced in a manner not contemplated. "If he did not intend it in kind, yet if it was the ordinary effect of the cause, he is responsible." Bishop, Crim. Law, sec. 641. And when two or more persons combine or conspire to commit a criminal offense, each is responsible for the acts of the others in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended. *McLeroy* v. *State,* 120 Ala. 274, 25 So. 247; *State* v. *White,* 138 N. C. 704, 51 S. E. 44; *Hamilton* v. *People,* 113 Ill. 34, 55 Am. Rep. 396; *State* v. *Maloy,* 44 Iowa, 104; *Peden* v. *State,* 61 Miss. 267. In the present case the evidence shows that these young men deliberately conspired to engage in a dangerous criminal enterprise,

the object of which was to assault and do serious bodily harm to the deceased. We say serious bodily harm, because the evidence leaves no room for doubt that the fence palings with which the defendant and Dougherty armed themselves were dangerous weapons,—quite as dangerous as the knife with which it is contended the fatal blow was struck. Those palings were of such a size and weight that, when wielded by two able-bodied men, they were likely either to produce death or great bodily harm; and, when the fact is taken into consideration that from each protruded long, sharp-pointed wire nails, their dangerous character is still more apparent. In *Hopkins* v. *United States,* 4 App. D. C. 430, 442, it was ruled that "a brickbat in the hands of a strong man, bent upon mischief, is certainly a formidable missile, and perilous to life if used in a malicious and dangerous way." In *Hamilton* v. *People,* 113 Ill. 34, 55 Am. Rep. 396, it was ruled that "a hoe, both in popular and legal signification, is *per se* a deadly weapon." The court further observed "that such things as persons of ordinary intelligence are presumed to know are not required to be proved." In *State* v. *Phillips,* 104 N. C. 786, 10 S. E. 463, it was ruled that where an assault was charged to have been committed with "a club," those words, *ex vi termini,* imputed a deadly weapon, since such a weapon probably would produce death or great bodily harm when used to strike a blow. Wharton, in his "Precedents of Indictments," vol. 1, 244, approves a precedent for assault with "a large stick," when it was necessary to allege an intent to kill. The deadly character of the heavy palings, with their protruding, sharp-pointed wire nails, when used as the evidence shows they were used by the defendant and Dougherty, is too clear to admit of argument. Malice must therefore be presumed.

How, then, can it reasonably be said that the death of Spencer was not the result naturally to be expected in the execution of the conspiracy into which these young men entered, whether the death resulted from the use of the fence palings or from the use of a knife? The purpose and intent of the conspirators was either to kill Spencer or to do him great bodily harm, and, under such circumstances, where death ensues, all are guilty not of

manslaughter, but of murder, either in the first or second degree, according as premeditation has or has not been shown. Nor does the fact, if it is a fact, that one of the conspirators used a weapon of a different kind, effect the result; for the intent was ever present in the minds of all, either to kill or do great bodily harm. The court's charge, therefore, was more favorable to the defendant than the facts warranted.

What the crime would have been had it appeared that the original purpose of the conspirators did not contemplate the use of dangerous or deadly weapons, we need not determine. Where, however, several strong men join in a criminal attack upon a defenseless man, knock him down, and, when he attempts to escape, pursue him and then with augmented numbers continue the assault, and one of the conspirators, while his confederates are beating their victim, plunges a knife into him, it would seem strange if the other conspirators could not be successfully charged with manslaughter, even though they did not contemplate the use of the knife. In such an attack the conspirators must be presumed to know that great force and violence probably will result, even though no deadly weapons are used; in other words, that serious consequences to the person attacked are liable to ensue. Knowing this, are they to escape with a prosecution for simple assault because one of their number, more vicious than themselves, makes what was liable to happen a certainty by using a deadly weapon? We think not. All those who, by their presence, encourage a prize fight, are guilty of manslaughter if death results to one of the fighters, upon the theory that the fight is prearranged and that great violence is to be expected. 1 East, P. C. 270; *Murphy's Case,* 6 Car. & P. 103; *Hargrave's Case,* 5 Car. & P. 170. In a prize fight the fighters are supposed to meet upon an equal footing, and, if those witnessing the fight are to be held responsible for its fatal termination, there is even stronger reason for charging several conspirators with responsibility for the fatal termination of a vicious assault upon an individual. Each conspirator is bound to know that such an enterprise begets brutality, and that in its execution serious consequences are liable to result. They

may not escape responsibility, therefore, for a result not intended, if it was immediately connected with their unlawful assault. Any other rule would not properly safeguard the citizen, and would amount to a premium upon lawless violence.

But an act done by one of several conspirators who have unlawfully assembled, and are actually perpetrating a crime, if entirely outside of the common purpose, and not inspired by the other conspirators or participated in by them, will not render them liable therefor. 1 Bishop, Crim. Law, sec. 634, and cases there cited; *Lamb* v. *People,* 96 Ill. 73; *Rex* v. *Murphy,* 6 Car. & P. 103.                                         *Affirmed.*