Andre W. MARSHALL, Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–800.

District of Columbia Court of Appeals.

Argued Feb. 5, 1992.
Decided June 26, 1992.
Rehearing and Rehearing In Banc
Denied May 4, 1993.

R. Kenneth Mundy, Washington, DC, for appellant.

Paul K. Carwile, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, DC, were on brief for appellee.

Before FERREN and KING, Associate Judges, and PRYOR, Senior Judge.

KING, Associate Judge:

Appellant was indicted along with Kevin Marshall and Theodore Taylor ("Taylor"), for the offenses of armed first degree murder (premeditated and deliberated) (D.C.Code §§ 22–2401, –3202 (1989 Repl.)); armed felony-murder (*id.*); armed first degree burglary (D.C.Code §§ 22–1801(a), –3202) (1989 Repl.); possession of a prohibited weapon, baseball bat ("PPW") (D.C.Code § 22–3214(b) (1989 Repl.)); and carrying a pistol without a license (D.C.Code § 22–3204 (1989 Repl.)) arising out of an altercation which ended with the shooting death of Kenneth Taylor ("decedent") on March 26, 1988, inside apartment 301 at 1438 Cedar Street, S.E. Appellant was tried separately in May 1989, and a jury returned guilty verdicts on the armed felony murder, the armed first degree burglary, and the PPW counts. The jury failed to reach verdicts on the remaining counts. Appellant raises a number of issues in his challenge to those convictions. We find that none justifies reversal and, accordingly, we affirm.

I.

As presented by the government, the sequence of events leading to the killing began and ended at the apartment of one Janice Settles at 1438 Cedar Street, S.E., a premises regularly used to ingest crack cocaine. Early in the day in question, Theodore Taylor arrived at the apartment with his girlfriend Tawanna Matthews ("Matthews"). Also present were Kirk Shephard ("Shephard"), Percy Settles (Janice's brother), Dwight Jones ("Jones"), and the decedent. Janice Settles, who had been out of the apartment, returned shortly af-

ter the arrival of Theodore Taylor and Matthews. An altercation broke out between Taylor and Shephard over the attentions of Matthews, and Janice Settles directed Taylor and Matthews to leave the apartment. They did as Janice Settles asked.

After the two left, those remaining began smoking crack cocaine. Some time later, from her window, Janice Settles saw Theodore Taylor, Kevin Marshall, and appellant descending some steps near where a neighbor, Mary Deloatch ("Deloatch"), lived. Taylor was carrying a baseball bat and the other two were walking with him. The three entered her apartment building and proceeded to her apartment where they gained entrance.[1] Taylor approached Shephard and struck him with the bat. Janice Settles then told the three to leave. Taylor and appellant complied; however, Kevin Marshall was unable to follow the other two out of the apartment because the door jammed.

Janice Settles further testified that decedent then appeared from a bedroom, and he and Kevin Marshall went at it. At this point Kevin Marshall had the bat in his possession and he struck decedent with it. The two then struggled over the bat and Kevin Marshall called out to appellant to come to his assistance. At that point Janice Settles went into a bedroom and saw nothing further. She did hear two shots after entering the bedroom.

Matthews testified that she was inside another apartment in the same building when she saw the group of three arrive at the apartment building and go to Janice Settles' apartment. She followed them and saw Theodore Taylor and Kevin Marshall gain entrance. She also witnessed Taylor and Kevin Marshall engage in altercations, first with Shephard and then with decedent. Kevin Marshall called out for appellant and he too entered the apartment. She then heard a single shot, and was then told by appellant to go downstairs. She complied with that order and then heard a second shot. Later she observed Taylor,

Kevin Marshall, and appellant walk down the stairs together.

Jones testified he was present in the apartment and heard, but did not see, the fight. He heard appellant ask decedent several times to hand over the bat. A shot followed this demand. He then heard appellant again ask decedent for the bat; he then heard a second shot.

Percy Settles testified that during the fight over the bat, he saw appellant with a small silver gun in his hand which he fired,[2] causing everyone to scatter. Appellant then fired a second shot which prompted an exodus out of the front door. Percy Settles then discovered that decedent had been shot. Death followed shortly thereafter.

Deloatch testified that she observed three males descend the stairs near her home going in the direction of 1438 Cedar Street. One of the group was swinging a bat and "they were cursing and swearing. They were going to mess up somebody." She did not see their faces but saw them enter the apartment building and go up the steps. Not long after she heard two shots.

On his own behalf, appellant testified that, before the shooting, he saw Theodore Taylor emerge from a building carrying a baseball bat acting very angry. He and Kevin Marshall followed Taylor in an effort to stop him and retrieve the bat. He testified that he did not know why Taylor was angry and that neither he nor the other two were armed with a pistol. He followed Taylor to the Cedar Street apartment where he tried to act as a peacemaker. He also testified that immediately prior to the gunshots he and Kevin Marshall went into the hallway leaving Taylor inside. He denied killing the decedent.

The jury was instructed with respect to the armed felony murder, armed first degree burglary, and the PPW counts, on both principal offender and aider and abettor theories. The instruction for the premeditated and deliberated murder charge,

---

1. Although the record is not entirely clear on the manner of the entry, it appears that it was neither forced nor without permission.

2. Percy Settles further testified that "I think" the shot was fired into the floor.

however, was as principal offender only. The court declined a defense request for the self defense instruction for the armed felony murder count as an aider and abettor.

## II.

■ Most of the issues raised by appellant require only brief discussion. First, appellant claims the trial court erred by allowing Percy Settles to testify to what appellant characterizes as non-expert opinion. The witness first testified that he had seen appellant with a gun, that there was a lot of tussling, and that appellant then fired the gun. When asked where the first shot went, he replied, "Down to the floor, I think." Appellant claims this response constitutes opinion testimony which is inadmissible since the witness was not qualified as an expert. We do not agree. We note that an expended slug was in fact recovered from the floor and we are satisfied that the witness' response to the prosecutor's question was, at most, nothing more than an inference he had drawn from observations he actually did make. This inference was a natural and reasonable one to draw based upon the totality of the evidence, and we are satisfied that it did not constitute impermissible lay opinion evidence. Even if we were to accept appellant's characterization of the evidence, we conclude that under the circumstances the statement was unimportant and therefore not harmful to his cause. It was the fact that the gun was fired that is important to the government's case, not the direction of firing.

■ Second, appellant challenges the trial court's ruling that permitted Janice Settles to testify that she had seen a Derringer in appellant's possession about two months prior to the killing. At trial appellant objected to admission of this evidence on the grounds that it was inadmissible "other crimes" evidence under *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). In this court he has aban-

doned the "other crimes" argument, but does challenge its admissibility on the grounds of relevance. We are satisfied that neither ground provides a sufficient basis for finding trial court error. We have held on several occasions that evidence of possession of a weapon on an earlier occasion by one later charged with using a similar weapon is probative, relevant evidence. *Jones v. United States*, 477 A.2d 231, 239 (D.C.1984) (possession of pistol one month before shooting held admissible); *Coleman v. United States*, 379 A.2d 710, 712 (D.C.1977) (photo of defendant with pistol five months earlier held admissable). The prior possession by an accused of the physical means of committing the charged offense is evidence of the probability of his guilt and is therefore admissible. *Id.* at 712. Moreover, the trial judge here instructed the jury that the testimony regarding the prior possession of the Derringer could be considered only as evidence that appellant had the means to commit the charged offense. Under these circumstances we find no error in the trial judge's admitting the testimony in question.

■ Third, appellant claims that the trial judge erred when he permitted the prosecutor to impeach Matthews with her grand jury testimony after a claim of surprise.[3] Specifically, he argues that the government failed to establish, as required by our cases, that the testimony affirmatively damaged the government. *Jefferson v. United States*, 558 A.2d 298, 301 (D.C. 1989); *Scott v. United States*, 412 A.2d 364, 367–68 (D.C.1980); *see* D.C.Code § 14–102 (1989 Repl.). We find no basis for that claim.

In her earlier report to police, and before the grand jury where she adopted those statements as her testimony, the witness stated that: she saw appellant step into the struggle between the decedent and Kevin Marshall over the bat; when the decedent declined to release the bat after being told to do so, appellant pulled a pistol from his

---

**3.** Appellant also claims that the trial judge improperly interfered in the proceedings by suggesting a tactical approach to the prosecutor to establish a basis for the claim of surprise. See *Robinson v. United States*, 513 A.2d 218, 222 (D.C.1986). We find nothing in this record to support such a claim.

pocket and pointed it at decedent's head; he then fired the pistol into the floor; and, he then directed her to leave the apartment. Finally, she had also identified appellant from a photo array as the person who had pulled and fired the gun. At trial she testified that she never saw appellant with a gun, that she had not identified him from the photo array as the shooter, and that at the time the first shot was fired he had both hands in his pockets. The effect of this testimony was to exonerate defendant as a principal in the shooting. *See Price v. United States*, 545 A.2d 1219, 1225 (D.C.1988). It contradicted the testimony of Percy Settles, who had placed the gun in appellant's hand at the time of the firing of the first shot. It certainly affirmatively damaged the government's case, and there is no serious question that the prosecutor was surprised by the testimony. Accordingly, we find no error in the court's ruling that permitted the prosecutor to claim surprise and impeach its witness.

### III.

█ At the conclusion of the defense case, counsel asked the court for a ruling *in limine* with respect to whether it would permit the government to cross-examine a character witness concerning a previous arrest of the appellant for possession of a controlled substance (PCP). That arrest had taken place in March 1988. Appellant later pleaded guilty to attempted possession of a controlled substance in that case and was given a sentence of probation without judgment pursuant to D.C.Code § 33–541(e) (1989 Repl.). The sentence was apparently vacated some time before this trial, because probation was successfully completed.[4] Counsel indicated the character witness would testify as to appellant's reputation[5] in the community for peacefulness and non-combativeness.[6] The trial judge ruled that the witness could be cross-examined about appellant's drug arrest. Based upon that ruling, the defense elected not to present the testimony.

Appellant's argument to the trial court, repeated here, was that the arrest offense had no relationship to the character trait in question and therefore, it would be improper to allow the witness to be questioned about it. The trial court reasoned, however, that it is simply plain common sense that there is an unfortunate coexistence of guns, money, drugs and violence. Thus, he concluded there is a clear connection between the asserted character trait and the arrest offense. We agree.

We recently stated that "as has been often observed, drugs and weapons go together." *Peay v. United States*, 597 A.2d 1318, 1321 (D.C.1991) (en banc); *see, e.g. United States v. Payne*, 256 U.S.App.D.C. 358, 361, 805 F.2d 1062 (1986) (collecting cases). Moreover, we have noted the "melancholy proposition" voiced by a police drug expert that "when you relate to drugs and guns, its like a marriage," *Irick v. United States*, 565 A.2d 26, 31 (D.C.1989). We concluded that such testimony would be helpful to a jury. *Id.* We hold, therefore, that the trial judge did not err in ruling that a character witness offered to testify concerning appellant's good reputation for peacefulness and non-combativeness can be questioned about appellant's arrest for possession of PCP[7] that occurred approximately one year before the offense for which he was on trial.

---

4. Appellant testified on his own behalf. Since this disposition of the case was not a "conviction," he could not be impeached under D.C.Code § 14–305 during his own testimony. *Twitty v. United States*, 541 A.2d 612, 613 (D.C. 1988).

5. The proffer was that the witness would testify as to appellant's reputation in the community, not the witness's own opinion. *See Rogers v. United States*, 566 A.2d 69, 74 (D.C.1989).

6. Trial counsel conceded that cross-examination concerning the prior arrest would be proper if the asserted trait was "peace and good order."

7. We have previously had occasion to refer to the testimony of an expert witness about the effect PCP has upon a user. *Coates v. United States*, 558 A.2d 1148, 1151 (D.C.1989) (PCP "users may act in a very violent and irrational way following use of the drug").

The government also argues that appellant should be precluded from even raising this issue since the prospective witness was never called to the witness stand. See *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). *Luce* dealt with an *in limine* ruling that the defendant could be impeached with certain prior convictions, a decision which caused the defendant to opt not to testify. On appeal he challenged the propriety of the trial court's ruling. The Supreme Court held, however, that in order "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 43, 105 S.Ct. at 464.

The government argues here that appellant has not properly presented this issue since the witness did not testify. It points out, for example, that it is conjectural whether the witness would have testified consistent with the proffer or whether the government would have even elected to cross-examine the character witness concerning appellant's arrest. We note, with respect to the latter point, that there is nothing in the record indicating that the prosecutor contemplated asking the witness about appellant's arrest. The court assumed it would but in the thirteen pages of transcript dealing with the issue, the prosecutor gave no indication that was his intention.

At least one other problem is raised by the absence of concrete testimony from the witness. Counsel proffered that the witness had known appellant for "several" years, without elaboration concerning the time period of the relationship. The drug offense arrest occurred more than two years before the trial (*i.e.* a March 1988, arrest, versus a May 1990, trial). The wit-

ness may not have known appellant at the time of his arrest.[8] More significant, the community where appellant's reputation resided, may not have known him at the time of the arrest. Those factors may, or may not, have affected the trial court's ruling had he known of them. But, the failure to present them in a more precise proffer, or by the witness's actual testimony, prevented those uncertainties from being explored. Finally, of course, as the Supreme Court pointed out in *Luce,* unless the witness testifies and is questioned on the point at issue, any harmless error analysis would be difficult, if not impossible, to undertake. *Id.,* 496 U.S. at 42, 105 S.Ct. at 463.

We do not need to reach the issue raised in *Luce* in this case, however, because we have concluded that the ruling allowing the question to be put to the character witness was proper. We express no view, therefore, on the applicability of *Luce* to this or other similar situations.[9]

### IV.

Finally, appellant challenges his convictions for burglary and PPW on grounds of evidence insufficiency. We note that appellant has not raised a like claim with respect to the felony-murder charge. Any attack upon the burglary conviction, however, is necessarily an attack upon the felony-murder charge since commission of the burglary is an element of felony-murder. Since the two offenses are linked, we will examine the sufficiency of the evidence for both offenses.

█ Appellant was charged with burglary, PPW, and felony-murder[10] as both a principal and as an aider and abettor. With respect to the latter theory, appellant

8. Counsel proffered that the witness knew of the arrest and that fact would not affect his testimony. There was no proffer, however, concerning whether the witness knew of the arrest at the time it occurred, or whether members of the community knew at all about the arrest.

9. We have held, however, that *Luce* would not apply to trials occurring before *Luce* was decid-

ed. *See Langley v. United States,* 515 A.2d 729, 733 (D.C.1986).

10. Appellant was also charged with premeditated and deliberated first degree murder. The jury was unable to reach a verdict on that charge.

is charged as being an accomplice to Theodore Taylor acting as principal. We have no doubt that a jury could reasonably find appellant guilty, beyond a reasonable doubt, on either basis. It is axiomatic that in weighing an evidence insufficiency claim, this court must view the evidence in the light most favorable to the government, draw all reasonable inferences from that evidence, and defer to the jury the right to weigh the credibility of witnesses. *Wells v. United States,* 515 A.2d 1108, 1111 (D.C.1986).

▮▮▮ In order to prove armed first degree burglary, the government must establish beyond a reasonable doubt, an armed entry (by appellant or by a principal aided and abetted by appellant) into an occupied dwelling with the intent to commit a crime therein. D.C.Code § 22–1801(a) (1991 Repl.).[11] The intent to commit the crime inside the premises must have been formed by the time of the entry. *Warrick v. United States,* 528 A.2d 438, 442 (D.C. 1987). Intent is the state of mind of the accused at the time of entry which is ordinarily proved by circumstantial evidence. *Shelton v. United States,* 505 A.2d 767, 770 (D.C.1986). Here, appellant was charged in the indictment, along with Theodore Taylor and Kevin Marshall, with entering the occupied premises of Janice Settles with "intent to commit an assault," and the jury was instructed that he could be convicted of that offense as either a principal or an aider and abettor.

▮▮▮ The jury heard testimony that Taylor, having been angered by the events earlier in the day at the Cedar Street apartment, armed himself with a baseball bat and headed back to that address with the purpose of assaulting Shephard. En route he was joined by appellant and Kevin Marshall and, as a group, as they neared their destination, they were heard, by Deloatch, to be yelling, cursing and promising to "mess up" someone.[12] The trial judge characterized the actions of the three as "pumping each other up." Deloatch herself could not identify appellant, or anyone else in the group, but her testimony, together with the testimony of Janice Settles and Tawanna Matthews, leads to a permissible conclusion that the group doing the threatening was the same group, *i.e.* Theodore Taylor, Kevin Marshall and appellant, that arrived outside apartment 301 shortly afterward.

That group then gained entrance to the apartment and Taylor promptly assaulted Shephard. The assault upon Shephard led almost immediately to the intervention of the decedent, the momentary departure of Taylor and appellant, and the encounter between Kevin Marshall and the decedent. Kevin Marshall's call for assistance led to the return of Taylor and appellant to the apartment and their assistance to Kevin Marshall in his altercation with the decedent. Either Theodore Taylor[13] (aider and

**11.** D.C.Code § 22–1801(a) (1991 Repl.) provides:

Whoever shall, either in the nighttime or in the daytime, break and enter, or enter without breaking, any dwelling, or room used as a sleeping compartment in any building, with intent to break and carry away any part thereof, or any fixture or other thing attached to or connected thereto or to commit any criminal offense, shall, if any person is in any part of such dwelling or sleeping apartment at the time of such breaking and entering, or entering without breaking, be guilty of burglary in the first degree....

**12.** Deloatch's entire testimony on this point was:

They was going down the step and had a baseball bat. And they was swinging that baseball bat and they were cursing and swearing. They were going to mess up somebody.

They was carrying on, you know, they was really performing.

\* \* \* \* \* \*

Well, he said he was going down there to 'fuck the mother fucker up.' That's what they said. One was in the back. He was throwing up his hands. They was really getting excited. All I know they was excited. They went on down the street.

\* \* \* \* \* \*

Yeah, they were cursing.

**13.** It was under this theory that appellant requested the trial court to instruct the jury on self defense. Appellant argued that Taylor was entitled to the instruction as the principal and therefore he was also entitled to the instruction as the alleged aider and abettor. Based on these facts we find no basis for the giving of such an instruction and, accordingly, hold that the trial

abettor theory)[14] or appellant himself (as principal) then inflicted the fatal wound.

The jury could permissibly conclude from the Deloatch testimony that Theodore Taylor, Kevin Marshall and appellant were determined to use the bat on Shephard. Thus, the intent to assault had formed by the time the three crossed the threshold of the apartment during the initial entry. In short, all of the elements of the burglary had been committed by the time the three entered the premises the first time. The burglary was a separate and distinct act from the killing. The burglary, however, "may be deemed to be a continuing offense for purposes of the felony-murder statute." *Blango v. United States*, 373 A.2d 885, 888 (D.C.1977) (felony-murder committed where three men entered premises, walked up the stairs to the second floor, had a conversation with the decedent, then shot and killed him); *accord, People v. Mason*, 54 Cal.2d 164, 4 Cal.Rptr. 841, 351 P.2d 1025 (1960) (felony-murder conviction upheld where killing occurred 20 hours after entry during which defendant lay in wait for victim). The jury was presented with an "unbroken chain of facts and circumstances which link" the burglary committed at the initial entry[15] and the homicide. *Coleman v. United States*, 111 U.S.App.D.C. 210, 215, 295 F.2d 555, (1961), *cert. denied*, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962).

We are more than satisfied that these facts were sufficient to support verdicts of guilty for felony-murder, burglary and PPW. *Wells, supra* at 1111; *Blango, supra* at 888; *Waller v. United States*, 389 A.2d 801, 807 (D.C.1978) (only intent to commit the underlying felony need be proven for felony-murder conviction). To be sure, some of the facts recited above were disputed or contradicted by the defense at trial. The jury, however, was free to accept the facts as set forth, as it obviously did by it's verdicts. *Id.* Accordingly, we are satisfied that there was sufficient evidence to support the guilty verdicts for burglary, PPW, and felony-murder.

Having concluded that no claim of error justifies reversal of the guilty verdicts, the convictions being appealed are hereby

*Affirmed.*[16]

FERREN, Associate Judge, dissenting in part and concurring in the result only:

Unraveling the twisted threads of this complicated murder case requires a thorough analysis of our felony-murder law. I believe the majority's two paragraph analysis on the sufficiency of the evidence for felony-murder, *see ante* at 557-558, falls short of the task. In an attempt to clarify what our law is, for purposes both of this case and of future cases, I undertake in Part I a detailed review of our precedents establishing the required elements to sustain a conviction for felony-murder under principal and accomplice theories of liability, respectively. In Part II, I review in detail the government's evidence in this case under each of those theories. In Part

---

judge did not err. See *Mitchell v. United States*, 399 A.2d 866, 869 (D.C.1979).

**14.** Judge Ferren, in his separate opinion, expresses some misgivings with what he recently wrote as the authoring judge of *Prophet v. United States*, 602 A.2d 1087, 1095 (D.C.1992) on the issue of accomplice felony-murder liability. *See infra* at 563–564.

The authoring judge of *this* opinion, who was also a member of the division that unanimously decided *Prophet* five months ago, has no such second thoughts, and continues to believe that the conclusion reached on that issue in *Prophet* is sound.

**15.** The killing took place immediately after the second entry by appellant made in response to Kevin Marshall's call for help. There was also

evidence presented by the testimony of Matthews that appellant himself did not enter the apartment at the time of the first entry but did so only after Kevin Marshall called out for assistance. The jury was free to conclude that appellant committed the burglary at the second entry (whether he was entering for the first or second time) and that the killing, almost immediately after that entry, was a felony-murder committed in furtherance of that burglary.

**16.** The parties agree, as did the trial court, that the armed first degree burglary conviction merges with the felony-murder conviction. *See Williams v. United States*, 483 A.2d 292, 294 n. 2 (D.C.1984), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). Therefore, the case is remanded to permit the trial judge to vacate the armed burglary conviction.

III, I briefly state my other concerns about the majority opinion.

## I. The Felony–Murder Doctrine

As the Supreme Court of Michigan has observed, "[t]he existence and scope of the felony-murder doctrine have perplexed generations of law students, commentators, and jurists." *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304, 306 (1980). "Historians and commentators have concluded that the rule is of questionable origin and that the reasons for the rule no longer exist, making it an anachronistic remnant...." *Id.,* 299 N.W.2d at 307. *See generally id.* at 307–16 and sources cited therein (discussing history of the doctrine, including statutory and judicial limitations of it); W. LaFave & A. Scott, 2 Substantive Criminal Law § 7.5(d), at 206–21 (1986) (same). The felony-murder doctrine is an anomaly in the law of homicide because the government is not required to prove the defendant had the *mens rea* for murder, such as "deliberate and premeditated malice," D.C.Code § 22–2401 (1989); the *mens rea* necessary to commit the underlying felony is said to satisfy the *mens rea* for felony-murder.

> The rationale of the doctrine is that one who commits a felony is a bad person with a bad state of mind, and he [or she] has caused a bad result, so that we should not worry too much ... [if] the fatal result he [or she] accomplished was quite different and a good deal worse than the bad result he [or she] intended.

W. LaFave & A. Scott, Handbook on Criminal Law § 71, at 560 (1972). To limit harsh or unjust consequences of the doctrine, American courts and legislatures, in states that still follow the doctrine, have limited its reach in various ways by requiring, for example, that: the felonious act be inherently dangerous to life; the homicide be a "natural and probable consequence" of the felony; and the victim's death be "proximately caused" by acts within the scope of the felony. *See Aaron,* 299 N.W.2d at 312–16 (citing cases and statutes); II Model Penal Code and Commentaries § 210.2, at 29–43 (1980) (same).[1]

Given the modern American trend for limiting the scope of the felony-murder doctrine, it is more than appropriate for this court to examine carefully what our own felony-murder statute and jurisprudence require, in order to assure that by judicial act we do not inadvertently extend the felony-murder net to ensnare those it should not. *See Aaron,* 299 N.W.2d at 313–14; *People v. Phillips,* 64 Cal.2d 574, 51 Cal. Rptr. 225, 232, 414 P.2d 353, 360 (1966); *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 261 A.2d 550, 555 (1970); *cf. Comber v. United States,* 584 A.2d 26, 49–52 (D.C.1990) (en banc) (taking such an approach to misdemeanor involuntary manslaughter).

### A. Principal Liability

D.C.Code § 22–2401 (1989), the District's first degree murder statute, applies the common law definition of felony-murder in specific, enumerated instances and classifies such homicides as first degree murder. *See United States v. Heinlein,* 160 U.S.App.D.C. 157, 168, 490 F.2d 725, 736 (1973) (citing *Hamilton v. United States,* 26 App.D.C. 382 (1905)); *see also United*

---

1. Some state courts have explicitly required a finding of a separate *mens rea* connected with the killing in addition to the intent associated with the felony. *See, e.g., State v. Galloway,* 275 N.W.2d 736, 738 (Iowa 1979) (instruction on felony-murder must include element of malice); *Aaron,* 299 N.W.2d at 327 (jury may not find malice from intent to commit underlying felony alone); *State v. Millette,* 112 N.H. 458, 299 A.2d 150, 153 (1972) (malice is an indispensable part of crime of murder and "is not an inference of law from the mere act of killing" during a felony); *State v. Harrison,* 90 N.M. 439, 564 P.2d 1321, 1324 (1977) (presumption that one who commits any felony has requisite *mens rea* to commit first degree murder is insupportable legal fiction; killing must be natural and probable consequence of felony); *State v. Doucette,* 143 Vt. 573, 470 A.2d 676, 682 (1983) (malice is essential element of felony-murder); *State v. Noren,* 125 Wis.2d 204, 371 N.W.2d 381, 384 (construing "natural and probable consequence" language of felony-murder statute to limit liability to deaths that were foreseeable consequences of felonious acts equal to "depraved mind" murder), *rev. denied,* 126 Wis.2d 519, 378 N.W.2d 292 (1985); *see also* Model Penal Code § 210.2 (requiring recklessness "under circumstances manifesting an extreme indifference to the value of human life" which may be presumed if killing occurs during certain enumerated felonies).

*States v. Branic,* 162 U.S.App.D.C. 10, 13, 495 F.2d 1066, 1069 (1974). Under the statute, the government need not prove intent to kill or a purposeful killing; rather, it must prove that the defendant inflicted a fatal injury on the deceased while the defendant was "perpetrating or attempting to perpetrate" an enumerated felony: arson, rape, mayhem, robbery, kidnapping, or armed housebreaking. *West v. United States,* 499 A.2d 860, 865–66 (D.C.1985); *Waller v. United States,* 389 A.2d 801, 807 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.22(A) (3d ed. 1978).

What, however, does "perpetrating or attempting to perpetrate" the underlying felony mean in the context of principal liability for felony-murder?

To hold a principal liable under a theory of felony-murder, the government must prove more than the commission of a felony followed by an unlawful killing. The government must show a sufficient causal nexus between the felony and the murder to prove that the killing took place as part of the perpetration of the felony. As the United States Court of Appeals for the District of Columbia Circuit has said:

> Something more than a mere coincidence of time and place between the wrongful act and the death is necessary. It must appear that there was such actual legal relation between the killing and the crime committed or attempted that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it.

*Heinlein,* 160 U.S.App.D.C. at 168, 490 F.2d at 736 (quoting *State v. Schwensen,* 237 Or. 506, 392 P.2d 328, 334 (1964)); *see United States v. Bolden,* 169 U.S.App.D.C. 60, 66, 514 F.2d 1301, 1307 (1975); *Head v. United States,* 451 A.2d 615, 625 (D.C.

1982); *cf. Green v. United States,* 95 U.S.App.D.C. 45, 46, 218 F.2d 856, 857 (1955) (when evidence at trial shows defendant committed felony and felony was sole cause of victim's death, evidence sufficient to find defendant guilty of felony-murder).

The requirement under § 22–2401 that the underlying felony be inherently dangerous (*i.e.,* arson, rape, mayhem, robbery, kidnapping, or armed housebreaking),

> must be distinguished from the *additional* requirement of "proximate" or "legal" cause. A given category of felony may be inherently dangerous, but it may still be that the death which actually occurred has come about in such an extraordinary way that as a matter of causation the defendant should not be held accountable for the death.... In a given case ... the victim's [death] may be so abnormal and unforeseeable that it cannot be said that his [or her] death was legally caused by the defendant's felonious conduct.

LAFAVE & SCOTT, 2 SUBSTANTIVE CRIMINAL LAW § 7.5(d), at 213.[2] Thus, the government must first prove that the principal committed an inherently dangerous felony and that somebody died; then it must prove that the death was legally caused by the principal's acts committed in furtherance of the felony. "In short, whether there is a sufficient causal connection between the felony and the homicide depends on whether the [principal's] felony dictated his [or her] conduct which led to the homicide." LAFAVE & SCOTT, HANDBOOK ON CRIMINAL LAW § 71, at 557.

"[T]he chain of circumstances between the felony and the killing must be unbroken." CRIMINAL JURY INSTRUCTIONS, *supra,* No. 4.22 (comment at 174) (citing *Coleman v. United States,* 111 U.S.App.D.C. 210, 295 F.2d 555 (1961), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962)). In *Coleman,* one of the two primary cases the majority relies on, *see ante* at 557–558, the

---

**2.** LaFave and Scott go on to say:

> In felony-murder cases as well as other homicide cases, it is often said that the death must have been the "natural and probable consequence" of the defendant's conduct. When death has occurred only as a consequence of some intervening act following the

defendant's conduct (as is frequently the case in the felony-murder context), the issue is frequently put in terms of whether the intervening cause was "foreseeable" (as distinguished from actually "foreseen").

LAFAVE & SCOTT, 2 SUBSTANTIVE CRIMINAL LAW § 7.5, at 214.

issue was whether a police officer's attempted seizure of a fleeing robber broke "the essential link between the robbery and the killing." 111 U.S.App.D.C. at 216, 295 F.2d at 561. During the seizure attempt, the defendant and two officers had struggled, resulting in the shooting death of one of the officers. The court upheld the trial judge's instruction to the jury that, to hold the defendant liable for felony-murder, the jury had to first find that the officers had not placed the defendant under arrest before the shooting occurred. *Id.* at 219, 295 F.2d at 563–64. In upholding the instruction, the court concluded: "The jury could not have failed to understand that the Government was bound to prove beyond a reasonable doubt that there has been an unbroken continuity between the robbery and the killing." *Id.*

This basic principle is firmly established in our caselaw. *See, e.g., Head,* 451 A.2d at 625 (for purposes of felony-murder, crime of robbery is continuing offense as long as asportation of goods continues); *Carter v. United States,* 96 U.S.App.D.C. 40, 42, 223 F.2d 332, 334 (1955) (during continuous police pursuit and while defendant is still sporting stolen goods, defendant guilty of felony-murder if defendant kills pursuer), *cert. denied,* 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827 (1956); *see also* C. TORCIA, 2 WHARTON'S CRIMINAL LAW § 148, at 214–20 (14th ed. 1979) (for purposes of felony-murder, felony is deemed to be still in progress if defendant has not left scene or if defendant is fleeing scene). Thus, if the principal commits the underlying felony and his or her felonious conduct—including flight from the scene—continues unbroken, a killing during the course of the unbroken chain of criminal activity is a killing "in the course of the [felony]." *Blango v. United States,* 373 A.2d 885, 888 (D.C.1977).

In *Blango,* the other authority chiefly relied upon by the majority, appellant and his codefendant entered the victim's home while armed with guns for the shared purpose of assaulting the victim, who earlier that evening had pistol-whipped the codefendant's brother. 373 A.2d at 886. Upon finding the victim upstairs along with several other persons, the codefendant almost immediately shot the victim with his .45 caliber gun. Before running for cover, two of the witnesses saw Blango reach for his belt. Two .25 caliber shots were fired at the victim; the government established by circumstantial evidence that Blango had fired the last two shots. *Id.* at 886–87. On these facts this court concluded that "Blango killed [the victim] on the premises in the course of the burglary [and] the requirements of the felony-murder statute were satisfied." *Id.* at 888.

In contrast to the above cases, if a principal abandons the felonious plan before the fatal shooting occurs, then the killing does not take place while the principal is perpetrating or attempting to perpetrate the felony. *See Mumforde v. United States,* 76 U.S.App.D.C. 107, 109, 130 F.2d 411, 413 (upholding trial court's instruction), *cert. denied,* 317 U.S. 656, 63 S.Ct. 53, 87 L.Ed. 527 (1942). There must be, however, "some appreciable interval between the alleged abandonment" and the act which caused the killing. *Id.* (quotation omitted); *see also Harris v. United States,* 377 A.2d 34, 38 (D.C.1977) (in felony-murder case, withdrawal from underlying criminal enterprise requires affirmative action to disavow underlying purpose or definite and decisive steps indicating disassociation); *cf. People v. Mason,* 54 Cal.2d 164, 4 Cal.Rptr. 841, 351 P.2d 1025 (1960) (although killing in victim's home took place 20 hours after defendant committed burglary by entering home, evidence—including defendant's past assaults on victim—sufficient to sustain felony-murder instruction).

In short, a principal is liable for felony-murder only when the government proves beyond a reasonable doubt that, while committing or attempting to commit—or fleeing from committing—one of the inherently dangerous felonies enumerated in the statute, the principal legally caused a death through some action in furtherance of the felony.

### B.  Accomplice Liability

The felony-murder clause of § 22–2401 imposes liability solely on the person who does the killing. "Other participants in the

felony are exposed to first-degree murder liability only by virtue of the aiding and abetting statute, D.C.Code [§ 22–105 (1989)]. Hence, the felony murder liability of an accomplice must be determined in accordance with common law concepts of vicarious liability." *Christian v. United States*, 394 A.2d 1, 48 (D.C.1978) (footnotes and citation omitted) (citing *Heinlein*, 160 U.S.App.D.C. at 167, 490 F.2d at 735), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Although the government need not prove an accomplice's intent to kill, it must show more than the accomplice's aiding and abetting of the underlying felony.

The accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts of another person which are " 'in furtherance of the common purpose, *if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.*' "

*Christian*, 394 A.2d at 48 (quoting *Collazo v. United States*, 90 U.S.App.D.C. 241, 248, 196 F.2d 573, 580, *cert. denied*, 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364 (1952) (quoting *Patten v. United States*, 42 App. D.C. 239, 247–49 (1914))) (emphasis added); *see Heinlein*, 160 U.S.App.D.C. at 168, 490 F.2d at 736.

This court has recently observed that for purposes of imposing liability for felony-murder, the law treats accomplices the same as principals. *See Prophet v. United States*, 602 A.2d 1087, 1096 (D.C.1992) (quoting *Waller*, 389 A.2d at 807). Given, however, the basic felony-murder principles applicable in the District of Columbia, as outlined above, it seems clear that the government must prove its case differently depending on whether its theory is that the defendant is a principal or an accomplice. How the requirements for accomplice felony-murder differ in practice from the requirements for principal felony-murder requires some analytical unpacking.

To prove its case against either principal or accomplice, the government must show that the principal committed an unlawful killing in furtherance of the felony, as demonstrated by a causal link—something more than coincidence of time and place—between the felony and the unlawful killing by the principal ("causal link" requirement). To prove its case against an accomplice, however, the government must prove two additional elements: (1) the accomplice at least aided and abetted the underlying felony ("aiding and abetting" requirement),[3] and (2) the principal's act that resulted in the killing was either within the scope of the "common purpose" shared by principal and accomplice or was the "natural or probable consequence" of an act in furtherance of the shared purpose ("scope of shared purpose" requirement). "Once these requisite elements are shown"—and only when the two additional elements are shown—can we say that " '[n]o distinction [is] made between principals and [accomplices] for purposes of felony murder liability.' " *West*, 499 A.2d at 866 (quoting *Waller*, 389 A.2d at 807) (third brackets added).

### C. Scope of Shared Purpose Requirement for Accomplice Liability

Just as I asked in Part I.A., above, "What does 'perpetrating or attempting to perpetrate' the underlying felony mean in the context of principal felony-murder liability?", I now ask: what do "common purpose" and "natural or probable consequence" mean in the context of accomplice liability?

In the absence of the scope of shared purpose requirement for accomplice liability, an accomplice would be liable for *all* acts of the principal, whether or not they were committed within the common purpose shared by the accomplice. As noted above, however, this court's decisions in *Christian* and *West* have followed cases, such as *Heinlein*, which require the government to meet the scope of shared purpose requirement in addition to the causal

---

**3.** A defendant could be a principal in the underlying felony, but his or her accomplice could be the one who commits the act that kills.

link and aiding and abetting requirements. Indeed, the standard felony-murder instruction for "multiple defendants" itself requires the government to meet the scope of shared purpose requirement:

[if] one of them, in the course of the felony [causal link requirement] *and* in furtherance of the common purpose to commit the felony [scope of shared purpose requirement], kills a human being, both the person who committed the killing and [those] who aided and abetted in the felony are guilty of murder in the first degree.

CRIMINAL JURY INSTRUCTION, No. 4.22(C), *supra* (emphasis added). If all the government had to prove was that the accomplice aided and abetted the felony and that the principal killed someone "in the course of the felony," the words *"and* in furtherance of the common purpose to commit the felony" would have no meaning.

Our most recent felony-murder case, unfortunately, appears to imply, relying on *Waller*, that the scope of shared purpose requirement is not a distinct element of accomplice felony-murder liability:

the intent requirement for murder, in the case against an aider and abettor, is satisfied *solely* by the aider and abettor's participation in the felony that resulted in the killing. *See United States v. Heinlein.*

*Prophet,* 602 A.2d at 1095 (emphasis added). (As authoring judge, I say "mea culpa.") Of course, this cannot really be so, since the court upheld the use of Criminal Jury Instruction 4.22, discussed above, which includes the scope of shared purpose requirement. But, on the basis of *Waller*, the court rejected Prophet's argument that we use the aiding and abetting principle of "reasonable foreseeability," *see Ingram v. United States,* 592 A.2d 992, 1003–04 (D.C.), *cert. denied,* —— U.S. ——, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991), to define the

admittedly vague "natural and probable consequences" language of our accomplice felony-murder liability doctrine. *See Prophet,* 602 A.2d at 1095; *see also Ingram,* 592 A.2d at 1000–04 (discussing uncertain and elastic meaning of "natural and probable consequences" and concluding that "reasonable foreseeability" is proper standard in context of aider and abettor instruction for armed robbery).

It is not clear from *Prophet,* other than from mere reliance on the language quoted, why the aiding and abetting principle of "reasonable foreseeability" is not an appropriate interpretation of "natural and probable consequences" in the context of accomplice felony-murder. It now appears to me, upon further reflection, that because accomplices are exposed to first-degree murder liability only by virtue of the aiding and abetting statute, D.C.Code § 22–105, *see Christian,* 394 A.2d at 48, *Ingram's* "reasonable foreseeability" test is equally applicable to accomplice felony-murder.

Under our law, because felony-murder liability for a principal is premised on the act, resulting in a killing, that was part of the commission of the felony, neither intent to kill nor foreseeability of death is a required element. *See Christian,* 394 A.2d at 48; *Branic,* 162 U.S.App.D.C. at 13, 495 F.2d at 1069.[4] For principal liability, therefore, if the act that causes the homicide was committed during the commission of the underlying felony (the causal link requirement), then whether the killing was foreseeable is irrelevant. That reasoning applies with equal force to accomplices: to meet the causal link requirement, whether the killing was intended or purposeful, ascertained by some test of foreseeability, is not an issue. "Only intent to commit the underlying felony need be proved." *Waller,* 389 A.2d at 807; *accord Prophet,* 602 A.2d at 1095.

---

**4.** On this point the current state of the felony-murder law of the District of Columbia is in conflict with jurisdictions that require a separate *mens rea* element or test of foreseeability for the act of killing, distinct from the underlying felony. *See* cases cited *supra* note 1. Furthermore, it should be pointed out that this

court, sitting en banc, recently held that "reasonably foreseeable risk of appreciable bodily harm" is an essential element of misdemeanor involuntary manslaughter. *Comber,* 584 A.2d at 51 n. 40, *rejecting Walker v. United States,* 403 A.2d 1163, 1165 (D.C.1979).

We have seen, therefore, that whether or not the consequence of the principal's act (death) is intended or foreseeable is irrelevant to meeting the causal link requirement for both principal and accomplice liability. But such causal link analysis differs from the question whether the principal's act which caused the death was "within the scope" of the shared purpose, or whether the death was a "natural or probable consequence" of the shared purpose. *Christian*, 394 A.2d at 48. This latter type of foreseeability, a kind of constructive intent with respect to the common purpose and plan for committing the felony, falls under the scope of shared purpose requirement, not the causal link requirement. *Cf. Comber*, 584 A.2d at 51 (to be guilty of misdemeanor involuntary manslaughter, defendant must commit inherently dangerous misdemeanor that creates a foreseeable risk of appreciable physical injury); *United States v. Jones*, 678 F.2d 102, 106 (9th Cir.1982) (for accomplice felony-murder, jury must find defendant aided and abetted the killing in addition to aiding and abetting the felony); *State v. Noren*, 371 N.W.2d at 384 (construing "natural and probable consequence" language of felony-murder statute to limit liability to deaths that were foreseeable). This meaning of foreseeability is demonstrated by the following hypothetical provided by Professors LaFave and Scott:

> Even though [accomplice and principal] have made no such agreement, if in the process of robbing or attempting to rob [victim] [principal's] gun goes off accidentally, killing [victim,] [accomplice] would be guilty of the felony murder of [victim] as much as [principal] would be, under the rule concerning parties to crime that all parties are guilty for deviations from the common plan which are the *foreseeable consequences* of carrying out the plan.

LaFave & Scott, 2 Substantive Criminal Law § 7.5, at 212 (emphasis added); *see, e.g., Wheeler v. United States*, 82 U.S.App. D.C. 363, 165 F.2d 225 (1947) (accomplice liable for felony-murder where principal

shot and killed person while robbing register in back of store while accomplice held gun on persons in front of store before robbing register in front).

Foreseeability under the scope of shared purpose requirement, therefore, is different from foreseeability under the causal link requirement.[5] As this court observed in *Ingram*, " 'natural and probable consequences' implies some degree of foreseeability," 592 A.2d at 1002, and therefore some degree of knowledge and intent, as do the legally operative terms "shared purpose" or "common purpose." *See Christian*, 394 A.2d at 48. In *Morriss v. United States*, 554 A.2d 784 (D.C.1989), this court, citing LaFave and Scott's chapter on "Limits of Accomplice Liability" and the section on "Foreseeability of Other Crimes," declared:

> [A]ccomplice liability extends to acts of the principal in the first degree that were a natural and probable consequence of the criminal scheme the accomplice encouraged or aided." 2 LaFave and Scott, *Substantive Criminal Law* § 6.8(b) 157 (1986). Thus, this doctrine was approved by us in application to a premeditated murder, *felony murder*, and first-degree burglary charge in *Williams v. United States*, 483 A.2d 292, 298–99 (D.C.1984), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).

*Id.* at 789 (emphasis added). Section 6.8(b) of LaFave & Scott and the cases and statutes cited therein make clear that reasonable foreseeability is a touchstone for "natural and probable consequence."

This court has never specifically addressed the distinction between foreseeability with respect to the causal link requirement and foreseeability with respect to the scope of shared purpose requirement. As the discussion and cases cited above indicate, however, there indeed is a distinction that is implicit in our doctrine of accomplice liability for felony-murder. Because *Prophet* did not purport to address the distinction, I conclude that this court has

---

**5.** Ten felony-murder states have provided by statute for some variation of a "not reasonably foreseeable" defense for accomplices. *See Aaron*, 299 N.W.2d at 316 & n. 82.

not yet settled the question of whether the aiding and abetting standard of "reasonably foreseeable," announced in *Ingram,* also applies to the scope of shared purpose requirement (rather than the causal link requirement) under the doctrine of accomplice felony-murder.

## II. The Government's Evidence in This Case

The government's theory under its first degree murder charge (and the lesser-included offense of second degree murder) was that appellant as principal—and not in the alternative as aider and abettor—murdered Kenneth Taylor ("decedent"). We know that the jury hung on that count. We, however, do not know on what theory the jury convicted appellant of felony-murder. As the majority points out, the government pursued two felony-murder theories against appellant: "[e]ither Theodore Taylor (aider and abetter theory) or appellant himself (as principal) then inflicted the fatal wound." *Ante* at 557–558. Because the jury was not instructed separately on each theory, we simply have no way of knowing on which of the two theories the jury convicted.[6]

It does matter, however. As indicated in Part I, the government must meet two requirements specific to its aider and abettor theory: in addition to meeting the causal link requirement (that the principal committed the act which killed the deceased in furtherance of the underlying felony), the government must also meet the aiding and abetting and scope of shared purpose requirements. Although some of our recent decisions—including the majority's opinion in this case—tend to obscure the distinctions between accomplice and principal felony-murder, I believe that those distinctions have not been (and should not be) erased from our law. Accordingly, I believe the most appropriate method for examining the sufficiency of the evidence on which the jury found appellant guilty of felony-murder is to examine the evidence in light of each of the government's distinct theories.

### A. Accomplice Theory

Under this theory, the government had to present legally sufficient evidence that appellant aided and abetted Theodore Taylor's "armed housebreaking," D.C.Code § 22–2401, *i.e.,* Taylor's entry into Janice Settles' apartment with intent to assault Shephard with a bat. That is the aiding and abetting requirement. *See Christian,* 394 A.2d at 48 (citing *Heinlein,* 160 U.S.App.D.C. at 167, 490 F.2d at 735); D.C.Code § 22–105 (1989). As the majority points out, *see ante* at 556–557, the evidence—in the light most favorable to the government—was sufficient for a reasonable juror reasonably to conclude that appellant aided and abetted Taylor's burglary.[7]

---

**6.** This is an inherent problem with the District's current standard jury instruction for felony-murder. *See* CRIMINAL JURY INSTRUCTION No. 4.22(A), (C). As Parts I.B. & I.C., *supra,* indicate, because of the additional—though often overlooked—requirements for proving accomplice felony-murder, specially-tailored instructions are appropriate when the government pursues both principal and accomplice liability theories against a single defendant. Because appellant voiced no objection (either at trial or on appeal) to the standard instruction the trial court gave, I merely note this apparent problem. Furthermore, appellant did not raise the issue of a jury unanimity problem.

**7.** This case, at its essence, is a murder case. In order to pursue an alternative theory, the government also charged armed burglary and felony-murder. Thus, the facts of this case in many respects are difficult to square with our burglary precedents. *See, e.g., Warrick v. United States,* 528 A.2d 438 (D.C.1987); *Shelton v. Unit-*

*ed States,* 505 A.2d 767, 770 (D.C.1986). This is troubling, because the only reason appellant was convicted of first degree murder was because the jury also convicted him of aiding and abetting a burglary.

There is no evidence that appellant assisted Taylor in his physical entry or assault of Shephard. Therefore, because appellant's mere presence is not enough to convict him of burglary, the single piece of evidence that links appellant to the burglary as aider and abettor is Mary Deloatch's testimony that she saw three males (it was essentially uncontested that the three were appellant, Theodore Taylor, and Kevin Marshall) "swinging that baseball bat and they were cursing and swearing they were going to mess up somebody." When asked by the prosecutor what specifically the three had said, Deloatch replied: "Well *he said he was going down here to 'fuck the mother fucker up.'* That's what they said. One was in the back. He was throwing up his hands. They was getting real excit-

The government next had to show that Taylor shot the decedent while "perpetrating or attempting to perpetrate" the burglary: the causal link requirement. *E.g., West,* 499 A.2d at 865–66; *Waller,* 389 A.2d at 807; *see* CRIMINAL JURY INSTRUCTION, No. 4.22. This is where the government's felony-murder accomplice theory falters. The government introduced no evidence that anyone other than appellant had a gun or struggled with the decedent over control of the gun. Only one witness, Percy Settles, testified as to who had the gun. He stated that after the first shot, he saw appellant holding the gun, and that just before the fatal second shot he saw the decedent grab appellant's wrist and saw the two of them struggling over control of the gun. The government presented other circumstantial evidence that tended to show appellant had pulled the gun; it presented no evidence that either Taylor or Kevin Marshall did.[8]

Because the government presented no evidence that the principal of the burglary, Theodore Taylor, shot the decedent, the evidence was insufficient to convict appellant of felony-murder under an accomplice theory. Thus, there is no need to examine whether the government met its burden with respect to the scope of shared purpose requirement, *i.e.,* that the killing was within the "common purpose" shared by Theodore Taylor, Kevin Marshall, and appellant, or was a "natural or probable consequence" of Taylor's burglary. *E.g., Christian,* 394 A.2d at 48; *Heinlein,* 160 U.S.App.D.C. at 168, 490 F.2d at 736. Because the majority in effect found the evidence sufficient to sustain appellant's conviction as an aider and abettor, as well as a principal, however, I examine the scope of shared purpose requirement in light of the evidence in this case in Part II.C., below.[9]

### B. Principal Theory

Under its theory that appellant committed felony-murder as a principal, the government had to show that appellant killed the decedent while perpetrating the underlying felony of armed burglary: the entry with intent to assault Kirk Shephard with the bat. That is the causal link requirement. It is not sufficient for the government to prove only that the burglary was followed by an unlawful killing; it must prove "that there was such actual legal relation between the killing and the crime committed ... that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it." *Heinlein,* 160 U.S.App.D.C. at 168, 490 F.2d at 736 (quoting *State v. Schwensen,* 392 P.2d at 334); *see Bolden,* 169 U.S.App.D.C. at 66, 514 F.2d at 1307; *Head,* 451 A.2d at 625.

Unlike the majority, I believe the question whether the government presented sufficient evidence to sustain appellant's conviction as a principal is a close call.

First, as already indicated, the government's evidence showing that appellant aided and abetted Theodore Taylor's entry with intent to assault was sufficient to establish appellant's participation in the underlying felony of armed burglary. Second, I agree with the majority that there was sufficient evidence to show that the decedent was killed by the second gunshot (this point was uncontested at trial) and that appellant had possession of the gun at the time of the first gunshot. Finally, although no one saw who fired the second, fatal shot, Percy Settles testified that he saw appellant and the decedent struggle over the gun just before it went off the second time, and several other witnesses heard appellant and the decedent arguing

---

ed." The juxtaposition of pronouns, highlighted above, makes it uncertain whether all three were actually "cursing and swearing they were going to mess up somebody." Defense counsel, however, was free to cross-examine Deloatch in order to clarify the situation for the jury.

**8.** Appellant testified that he had left the apartment and was in the building's hallway when the two shots rang out inside the apartment.

**9.** I repeat that the fact the government proves the principal killed someone while perpetrating the felony (satisfying the causal link requirement) does not necessarily mean that the same evidence is sufficient to meet the scope of shared purpose requirement. *See supra* Part I.C.

over the bat just before the second shot. Thus, the evidence was sufficient for a reasonable juror to conclude that appellant shot the decedent.

The jury, however, did not convict appellant of murder. Because the jury hung on both first degree premeditated murder and the lesser included offense of second degree murder, at least one juror did not believe appellant fired the second shot with the required mental state. *See* D.C.Code § 22–2401 (requiring "deliberate and premeditated malice" for murder in the first degree, other than felony-murder); *id.* at – 2403 (requiring "malice aforethought" for murder in the second degree). We can assume, however, that the jury believed that appellant shot the decedent, since all the government's evidence pointed to him, rather than to Theodore Taylor, as the triggerman. *See supra* Part II.A. Thus, because the jury did not find appellant had the necessary *mens rea* for murder, it convicted him of first degree murder solely because of the application of the felony-murder rule.

For us to overturn his conviction for felony-murder, therefore, appellant must show that the government failed in its burden of sufficiently proving the causal link between the burglary and the killing. In other words, if there was legally insufficient evidence of the causal link, our one choice would be to overturn the conviction.

In reviewing the sufficiency of the evidence for felony-murder, the majority summarizes:

> The assault upon Shephard led almost immediately to the intervention of decedent, the momentary departure of Taylor and appellant, and the encounter between Kevin Marshall and decedent. Kevin Marshall's call for assistance led to the return of Taylor and appellant and their assistance to Kevin Marshall in his altercation with decedent. Either Taylor ... or appellant ... inflicted the fatal wound.

*Ante* at 557.[10] From that factual summary the majority concludes that the burglary " 'may be deemed a continuing offense for purposes of the felony-murder statute,' " *id.* (quoting *Blango,* 373 A.2d at 888), and that "[t]he jury was presented with an 'unbroken chain of facts and circumstances which link' the burglary committed at the initial entry and the homicide," *id.* at 558 (quoting *Coleman,* 111 U.S.App.D.C. at 215, 295 F.2d at 560). Unfortunately, the majority does not explain how the government's evidence in this case proves that the burglary was a "continuing offense," as in *Blango,* nor does it explain why the chain of facts and circumstances was "unbroken," as in *Coleman. See supra* at 560–561 (discussing facts and holdings of *Blango* and *Coleman* ).

According to the government's own evidence at trial, the flow of events between Theodore Taylor's entry and assault of Shephard (one swing of the bat which Shephard blocked) and appellant's shooting of the decedent was not as uninterrupted as the majority's synopsis suggests. Of the government's three key eyewitnesses (Janice Settles, Percy Settles, and Tawanna Matthews), Janice Settles provided the most complete and understandable testimony regarding what happened before the shots were fired, while Percy Settles provided the most complete and understandable testimony regarding what happened at the time the shots were fired.

Both Percy Settles and Matthews testified that appellant told Theodore Taylor "don't fight with the bat" because Taylor and Shephard "knew each other." That corroborated testimony was not challenged. Janice Settles testified that after Taylor nonetheless swung the bat at Shephard, she intervened and ordered everybody out. Percy Settles corroborated Janice Settles' testimony. At about this time, the decedent came out of the bathroom and told everyone to stop arguing because "all of them grew up together." According to Janice Settles, appellant and Taylor complied with her order and left the apartment

---

**10.** In Part II.A., above, I explained why the evidence was insufficient to show that Taylor

inflicted the fatal wound.

and went back into the hallway. Matthews corroborated Janice Settles' story that appellant was in the hallway and not in the apartment at that point.[11] Although Kevin Marshall attempted to follow them, the door jammed and he got "stuck" inside. Then Kevin Marshall and the decedent began to argue, Marshall hit the decedent with the bat, and the two began struggling over the bat.

When Marshall called out for help, appellant reentered the apartment. According to Percy Settles' testimony, appellant then pulled a gun and fired it once into the floor. After everyone scattered, the decedent refused to give appellant the bat and the two of them began to struggle over the gun. That was the last thing Percy Settles saw, but shortly thereafter a second shot rang out, and appellant ran from the apartment.

Surely a reasonable juror could have concluded that, by telling Theodore Taylor not to use the bat and by leaving the apartment when ordered to do so by Janice Settles, appellant had either disassociated himself from the original criminal enterprise or that the chain of circumstances between the burglary and the killing had been broken. *See Coleman,* 111 U.S.App. D.C. at 216, 295 F.2d at 561; *cf. Harris,* 377 A.2d at 38. On the other hand, the jury could have "refused so to find." *Coleman,* 111 U.S.App.D.C. at 219, 295 F.2d at 564.

First, even though appellant had momentarily left the apartment, both the bat—the weapon on which the common purpose centered—and one of appellant's co-felons, Kevin Marshall, remained in the apartment. Thus, the jury could reasonably find that Kevin Marshall had not yet accomplished his escape from the scene of the crime and that appellant returned in order to further his co-felon's escape. Second, events happened very quickly, so the jury could have inferred that appellant's momentary departure—at about the same time the decedent entered the room to breakup the fighting

and arguing precipitated by the assault on Shephard—was not enough to break the chain of circumstances between the burglary and the subsequent deadly struggle between appellant and decedent. I conclude, therefore, that the government's evidence was sufficient for a reasonable juror to find the causal link between the felony and the killing in order to fairly infer guilt beyond a reasonable doubt. *See, e.g., Langley v. United States,* 515 A.2d 729, 731 (D.C.1986).

### C. Difference Between the Causal Link and Scope of Shared Purpose Requirements

Although I concur in the court's affirmance, to show why I believe the majority's approach in this case is inappropriate and incomplete, thereby raising warning signals for future accomplice felony-murder cases, I now briefly explain why the government's evidence—sufficient to meet the causal link requirement to convict appellant as a principal—was insufficient to meet the scope of shared purpose requirement necessary to convict appellant as an aider and abettor.

At the time of the altercation between the decedent and Kevin Marshall, the brief confrontation between Theodore Taylor and Shephard—the goal of the shared purpose—had ended. Although appellant accompanied the decedent to the apartment, thereby "aiding and abetting" Taylor's burglary,[12] there was uncontroverted testimony—by two government witnesses—that appellant told Taylor not to use the bat before Taylor took a swing at Shephard. Appellant thus took a significant step to abandon the common purpose of assaulting Shephard with the bat. Appellant only intervened in response to Kevin Marshall's call for help. Most importantly, the government presented no evidence that part of the purpose shared by Theodore Taylor, Kevin Marshall, and appellant was for one of them to carry a gun to use, if necessary,

---

**11.** Matthews testified that appellant did not enter the apartment when Theodore Taylor did, and that it was not until after Kevin Marshall and the decedent began fighting and Kevin Marshall called for appellant's assistance that appel-

lant first entered the apartment. Her story was corroborated by both appellant and Marshall.

**12.** *See supra* note 7.

in the confrontation with Shephard, let alone in a confrontation with someone else. There was no evidence that the two who were not carrying a gun knew the other one was carrying a gun. The government, therefore, did not prove that the shooting was within the scope of the shared purpose of appellant, Taylor, and Marshall; nor did it prove that the shooting was a natural or probable consequence of Taylor's entry with a bat with intent to assault Shephard.

As indicated in Part II.B., however, I concur in the majority's affirmance because the evidence was sufficient to convict appellant as a principal under the government's felony-murder charge.

### III. Trial Court Errors

I also take issue with the majority's treatment of two subsidiary issues in this case: the trial court's ruling *in limine* that would have allowed the government to question a defense character witness about appellant's prior arrest for simple possession of PCP, and the trial court's decision to allow the government to impeach its own witness with the witness' grand jury testimony. Although I conclude that the trial judge acted erroneously in both instances, given the government's eyewitness testimony and strong circumstantial evidence pointing to appellant as the principal in the government's felony-murder theory, I cannot conclude that there was an abuse of discretion warranting reversal: the errors did not have "a possibly substantial impact upon the outcome." *Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979).

#### A. *Appellant's Prior Drug Arrest and Character Trait of Peacefulness*

The majority upholds the trial court's ruling that the government could question appellant's prospective character witness about appellant's previous arrest for possession of PCP, a fact the jury did not know about. (After that arrest, appellant had pleaded guilty to attempted possession and had received and completed probation). The character witness would have testified as to appellant's character trait of peacefulness. The trial court's ruling resulted in

the defense not calling the witness to the stand because the defense did not want the jury to learn of appellant's previous arrest involving illegal drugs.

To support its position, the majority quotes decontextualized dicta from three cases in adopting the trial court's reasoning of "plain common sense that there is an unfortunate coexistence of guns, money, drugs and violence" and to uphold the trial court's conclusion that "there is a clear connection between the asserted character trait and the arrest offense." This, however, was not a drug case. Furthermore, appellant's previous arrest involved no guns or violence.

Whether the trial court has abused its discretion in making an evidentiary ruling depends in part on whether "the trial court's action was within the range of permissible alternatives." *Johnson*, 398 A.2d at 365. In this case the trial court declared that this court had determined that "possession of guns goes hand and glove with drug possession." To support that unequivocal statement, the trial judge cited our opinions in *Bigelow v. United States*, 498 A.2d 210 (D.C.1985), and *Wesley v. United States*, 547 A.2d 1022 (D.C.1988). Neither case, however, has anything to do about the proper scope of cross-examination of a defense character witness and the alleged connection between drug possession and guns/violence.[13]

Furthermore, the cases the majority cites in defense of the trial court—authority on which the trial court did not purport to rely—are also not on point. *Peay v. United States*, 597 A.2d 1318, 1321 (D.C.1991) (en banc), quoted *ante* at 555, is a *Terry*-stop case in which this court reviewed the trial court's denial of a suppression motion. In *Peay* the majority concluded that it was reasonable for a police officer to believe that a person carrying something in his hand in a building known for narcotics trafficking, and who had just failed to respond to the officer's request to stop, was carrying a weapon. Viewed in context, then, the quoted dicta, "as has often been observed, drugs and weapons go together,"

---

**13.** In addition the trial court cited *United States v. McDowell*, 246 U.S.App.D.C. 93, 762 F.2d 1072

(1985), which also has nothing to do with the proposition for which the court cited it.

refers to what it was reasonable for a police officer to believe in a fast-moving encounter with a suspect.

Likewise, *Irick v. United States*, 565 A.2d 26, 31 (D.C.1989), quoted *ante* at 555, also involves a completely different context. In that case the issue was whether it was reasonable for the trial court to allow a police expert to testify regarding illicit drug operations and how guns are used in such operations. That is a far cry from saying that the government can cross-examine a character witness about a defendant's unrelated, prior arrest for simple possession—without intent to distribute—resulting in a conviction of attempted possession, simply because the offense for which the defendant is now on trial involved the use of a gun.

Finally, *United States v. Payne*, 256 U.S.App.D.C. 358, 361, 805 F.2d 1062, 1065 (1986), cited *ante* at 555, does not support the majority's position. In fact, the D.C. Circuit Court takes care to show how the situation there did not violate FED.R.EVID. 404 (character evidence), which would seem to prohibit the government from rebutting evidence of a defendant's character for peacefulness with evidence that the defendant had a prior arrest for simple possession. The issue in *Payne* was whether guns seized from the defendant's apartment—along with illegal drugs and paraphernalia—were admissible as tools of the drug distribution scheme.

When the government raises questions about a defendant's previous illegal drug use in front of the jury, it raises a "highly inflammatory ... allegation," *United States v. Fowler*, 151 U.S.App.D.C. 79, 83, 465 F.2d 664, 668 (1972), which may "generate unwarranted prejudice" from the jury, *United States v. Sampol*, 204 U.S.App.D.C. 349, 395, 636 F.2d 621, 667 (1980), because of "hostility based on the general odium of narcotics use," *United States v. Kearney*, 136 U.S.App.D.C. 328, 332, 420 F.2d 170, 174 (1969). Because evidence of, or comments in front of the jury about, a defendant's illegal drug use and possession is so prejudicial, it is only permitted for specifically circumscribed purposes. Thus, for example, under no circumstances may evidence of a defen-

dant's drug use be introduced as a general attack on credibility. *See United States v. Leonard*, 161 U.S.App.D.C. 36, 52, 494 F.2d 955, 971 (1974), *cited with approval in Durant v. United States*, 551 A.2d 1318, 1326 (D.C.1988).

After the trial court's ruling, the defense refrained from calling its character witness, recognizing the inherent prejudice in allowing the government to raise in front of the jury the specter of appellant's arrest for possession of an illegal drug. Because the trial court's decision to allow the government to cross-examine the character witness about appellant's previous arrest was based on an erroneous interpretation of our law, the court's exercise of discretion was erroneous. *Johnson*, 398 A.2d at 365. In sum, the trial court failed to provide any sound legal basis for its personal view that appellant's previous arrest for simple possession related negatively to the proffered character trait of peacefulness. "As in its other decision-making activity, the court's substantial freedom of choice in an exercise of discretion must be tempered by rationality." *Id.* at 362.

### B. The Government's Impeachment of its own Witness

Finally, I disagree with the majority's summary treatment of appellant's claim that the trial court erred when it allowed the government to impeach its own witness, Tawanna Matthews, without making the requisite showing of affirmative damage under *Jefferson v. United States*, 558 A.2d 298, 301 (D.C.1989). *See ante* at 554. The trial court's ruling opened the door for the government to introduce large excerpts of Matthews' grand jury testimony and her statement to the police which, in contrast to her trial testimony, directly implicated appellant in the shooting.

Contrary to the majority's position, the fact Matthews did not admit at trial that she had previously identified appellant as the shooter and did not admit that she had seen appellant with a gun in his hand just before the shooting (counter to her statements to the police and Grand Jury), did not affirmatively damage the government's case. She in no way contradicted, rebutted, or weakened any of the government's

other evidence; she simply testified at trial that she had left the apartment before the first shot was fired. *Jefferson* teaches that failure to provide anticipated testimony is not affirmative damage. 558 A.2d at 301–02. The third ground the majority points to, however—that Matthews testified appellant had his hands in his pockets at the time of the first shot—would constitute affirmative damage, since it would indicate that appellant did not have possession of the gun, contrary to the government's other evidence.

It was the trial court, not the government, that first raised this last ground for finding affirmative damage. In fact, the trial judge himself admitted it was at least "arguable" that he had impermissibly interjected himself into the case by providing the government with the affirmative damage argument it needed. A review of the transcript—which the trial court did not do before ruling—shows that Matthews *did not* testify that when the gun went off appellant had his hands in his pockets (which is probably why the government did not raise the matter on its own). In fact, the prosecutor never even asked Matthews whether appellant had his hands in his pockets when the gun fired:

> Q. Ma'am, when did [appellant] tell you—did he tell you to go downstairs before the first shot or after the first shot?
>
> A. It was before the shot, because the shot was just going off.
>
> Q. When you saw him, when you looked at him and he looked at you [when appellant told her to go downstairs], did you see anything in his hand then?
>
> A. No. He just had his hands in his pockets, that's all.
>
> . . . .
>
> Q. Did you hear the statement from the defendant [telling her to go downstairs] and then bang, the shot.
>
> A. Yes. And I left.
>
> Q. Or did you hear the shot and then the statement?
>
> A. I heard it, he said leave and then the shot.

Given the above, I cannot support the majority's statement that there is "no basis for [appellant's] claim" that the government failed to show affirmative damage before impeaching its own witness, as required by *Jefferson. Ante* at 554. Although the witness' testimony was not a model of clarity, confusing or unclear testimony does not equal affirmative damage to the government's case.[14]

As I stated at the outset, however, appellant has failed to demonstrate adequately the possible prejudicial impact of the trial court's error and why it warrants the reversal he requests. *See Johnson,* 398 A.2d at 367.

### IV. Conclusion

For the reasons stated in Part II., I concur only in the affirmance of appellant's conviction for felony-murder as the principal in the shooting; the evidence was insufficient, however, to support appellant's conviction under the government's alternative theory of accomplice felony-murder.

---

**14.** Besides, it was the government that elicited the confusing testimony, and it was the government that failed to ask follow-up questions to clarify matters.